# EXHIBIT 1
# The *Carrillo-Lopez* Order

1

2

3                              UNITED STATES DISTRICT COURT

4                                    DISTRICT OF NEVADA

5                                          * * *

6    UNITED STATES OF AMERICA                    Case No. 3:20-cr-00026-MMD-WGC

7                            Plaintiff,          ORDER

8           v.

     GUSTAVO CARRILLO-LOPEZ,
9
                             Defendant.
10

11   **I.    SUMMARY**

12          On June 25, 2020, Defendant Gustavo Carrillo-Lopez was indicted on one count

13   of deported alien found in the United States in violation of 8 U.S.C. § 1326(a) & (b)

14   ("Section 1326"). (ECF No. 1.) Before the Court is Carrillo-Lopez's motion to dismiss the

15   indictment (the "Motion") on the grounds that Section 1326 violates the equal protection

16   guarantee of the Fifth Amendment under the standard articulated in *Village of Arlington*

17   *Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977).[1] (ECF No.

18   26.) On January 22, 2021, the Court heard oral argument on the Motion (ECF No. 39

19   ("Oral Argument")), and on February 2, 2021, the Court held an evidentiary hearing (ECF

20   Nos. 48, 49 (the "Hearing").[2]  Because Carrillo-Lopez has established that Section 1326

21   was enacted with a discriminatory purpose and that the law has a disparate impact on

22   Latinx persons, and the government fails to show that Section 1326 would have been

23   enacted absent racial animus—and as further discussed below—the Court will grant the

24   Motion.

25

26          [1]The government responds. (ECF No. 29.) Carrillo-Lopez replies. (ECF No. 30.)
27   Carrillo-Lopez filed two supplements to the Motion. (ECF Nos. 31, 33.)

28          [2]At the Hearing, Carrillo-Lopez called two defense experts: Professor Kelly Lytle
     Hernández and Professor Benjamin Gonzalez O'Brien. The Court ordered both parties to
     file post-hearing briefs. (ECF Nos. 50 (Carrillo-Lopez brief); 51 (government brief).)

## II.    DISCUSSION

Having considered the briefing, arguments of counsel, and expert testimony of Professors Benjamin Gonzalez O'Brien and Kelly Lytle Hernández, the Court ultimately grants the Motion. First, the Court will explain the applicable standard of review: the test outlined in *Arlington Heights*. Next, the Court will determine whether Carrillo-Lopez has met his burden. Because Carrillo-Lopez has demonstrated that Section 1326 disparately impacts Latinx people and that the statute was motivated, at least in part, by discriminatory intent, the Court finds that he has. Finally, the Court reviews whether the government has shown that Section 1326 would have been enacted absent discriminatory intent. Because the government fails to so demonstrate, the Court finds its burden has not been met and that, consequently, Section 1326 violates the Equal Protection Clause of the Fifth Amendment.

### A.    *Arlington Heights* applies to Section 1326.

As a preliminary matter, the Court must determine which standard to apply. The parties dispute, but the Court finds that the test outlined in *Arlington Heights* applies to criminal immigration laws such as Section 1326.

Under the Fifth Amendment's equal protection guarantee, a law can violate equal protection in three ways: (1) a law can discriminate on its face (*see, e.g.*, *Loving v. Virginia*, 388 U.S. 1 (1967)); (2) authorities can apply a facially neutral law in a discriminatory manner (*see, e.g.*, *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)); or (3) a legislature may enact a facially neutral law with a discriminatory purpose in a way that disparately impacts a specific group (*see, e.g.*, *Arlington Heights*, 429 U.S. at 265-68).

Carrillo-Lopez argues that Section 1326 violates his right to equal protection, specifically as articulated in *Arlington Heights.* The government counters that the statute should not be assessed under an equal protection framework because Congress' plenary power over immigration subjects immigration laws such as Section 1326 to a highly deferential standard of review. (ECF No. 29 at 7-11 (citing *Kleindienst v. Mandel*, 408

2

U.S. 753, 765 (1972); *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)).)[3] The government asserts that criminal immigration laws are to receive the same deferential review, or rational bias review. (*Id.* at 10-11 (citing *U.S. v. Hernandez-Guerrero,* 147 F.3d 1075, 1078 (9th Cir. 1998); *U.S. v. Ruiz-Chairez,* 493 F.3d 1089 (9th Cir. 2007); *U.S. v. Lopez-Flores*, 63 F.3d 1468 (9th Cir. 1995)).)

*Arlington Heights* applies here. As an initial matter, the Supreme Court has held that greater protections under the Fifth Amendment necessarily apply when the government seeks to "punish[] by deprivation of liberty and property." *Wong Wing v. United States,* 163 U.S. 228, 237 (1896) ("[E]ven aliens shall not be held to answer for a capital or other infamous crime, unless on a presentment or indictment of a grand jury, nor be deprived of life, liberty, or property without due process of law."). The Court is unpersuaded that a criminal law enacted by Congress is free from constitutional equal protection constraints, even if the offense relates to immigration.

The federal government's plenary power over immigration does not give it license to enact racially discriminatory statutes in violation of equal protection. The Ninth Circuit Court of Appeals and a plurality of the United States Supreme Court declined to adopt the standard advanced by the government in race-based equal protection challenges of immigration decisions by the executive, and instead applied *Arlington Heights. See Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.,* 908 F.3d 476, 518-20 (9th Cir. 2018), *rev'd in part, vacated in part sub nom. Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,* 140 S. Ct. 1891 (2020));[4] *see also Ramos v. Wolf*, 975 F.3d 872, 896-99 (9th Cir. 2020) (declining to apply a more deferential standard in favor of *Arlington Heights*). In both *Regents* and *Wolf,* the Ninth Circuit distinguished *Trump v. Hawaii,* 138

---

[3]The government describes at length how the "facially legitimate and bona fide" test initially laid out in *Mandel* and *Fiallo* was later held to be equivalent to the rational basis test, arguing that rational basis applies here. (*Id.* at 9 (citing *Ablang v. Reno*, 52 F.3d 801, 804 (9th Cir. 1995)).)

[4]On review, a plurality of the Supreme Court agreed with the Ninth Circuit that *Arlington Heights* applied. *See Dep't of Homeland Sec.* 140 S. Ct. at 1915-16. Ultimately, the plaintiff's claims were rejected on other grounds. *Id.*

S. Ct. 2392 (2019), where the Court applied a more deferential standard to an establishment clause challenge of an executive order concerning immigration. Specifically, the Ninth Circuit found that the standard applied in *Trump* did not similarly apply to equal protection challenges because it differed "in several potentially important respects, including the physical location of the plaintiffs within the geographic United States, the lack of national security justification for the challenged government action, and the nature of the constitutional claim raised." *Regents*, 908 F.3d at 520; *see also Wolf*, 975 F.3d at 895 ("[T]he deferential standard of review applied in *Trump v. Hawaii* turned primarily on the Court's recognition of the fundamental authority of the executive branch to manage our nation's foreign policy and national security affairs without judicial interference.").

The government's counterargument is not persuasive. The Ninth Circuit recognized a difference between situations that invoke the President's expansive executive authority "to respond to changing world conditions" in matters of national security and the Court's mandate to ensure all people are afforded equal protection under the law. *See Wolf*, 975 F.3d at 896 (quoting *Trump*, 138 S. Ct. at 2419). That Carrillo-Lopez challenges a criminal law—which goes to the "nature" of the Fifth Amendment's protective concern—applicable to those within the United States, rather than an immigration policy addressing national security concerns of those not within the United States, is further evidence that his equal protection challenge should be reviewed under a more heightened standard than the rational-basis standard that the government proposed.[5]

Moreover, the three Ninth Circuit cases the government relies on to argue that immigration laws are subject to rational-basis review despite "§1326's criminal character"

---

[5]If anything, the Supreme Court's justification in *Trump v. Hawaii* for increased deference is inapplicable to Congressional action, as the Court's review does not directly implicate the executive's core function. *See Ramos*, 975 F.3d at 895 ("[T]he deferential standard of review applied in *Trump v. Hawaii* turned primarily on the Court's recognition of the fundamental authority of the executive branch to manage our nation's foreign policy and national security affairs without judicial interference.").

1   fail to support such an argument. (ECF No. 30 at 10.) First, *Hernandez-Guerrero*
2   establishes only that Congress did not exceed its constitutional authority under its
3   immigration powers when it enacted Section 1326. *See* 147 F.3d at 1078. The Ninth
4   Circuit did not hear or address an equal protection challenge to Section 1326 in
5   *Hernandez-Guerrero*, much less determine which standard of review applies. Moreover,
6   both *Lopez-Flores,* 63 F.3d at 1475, and *Ruiz-Chairez*, 493 F.3d at 1091, simply establish
7   that a challenged alienage classification qualifies for rational-basis review. But here, race
8   and national origin, not alienage, is the classification in dispute.

9       Finally, the Court finds persuasive the fact that several district courts have similarly
10  applied *Arlington Heights* to race-based immigration challenges brought by individuals
11  residing in the United States,[6] including when reviewing equal protection challenges to
12  Section 1326.[7]

13      Considering the above, the Court finds that Section 1326 must be reviewed under
14  the *Arlington Heights* equal protection framework.

15      **B.    Carrillo-Lopez has met his burden under *Arlington Heights*.**

16      Having found that *Arlington Heights* applies, the Court must now determine
17  whether Carrillo-Lopez has met his burden. The Court finds that he has.

18  ///

19  ///

20  ///

21

---

22      [6] *See, e.g.*, *La Clinica de la Raza v. Trump*, -- F. Supp. 3d --, Case No. 19-cv-
    04980-PJH, 2020 WL 6940934, at *17 (N.D. Cal. Nov. 25, 2020); *California v. U.S. Dep't
23  of Homeland Sec.*, 476 F. Supp. 3d 994, 1022-23 (N.D. Cal. 2020); *Cook Cnty., Illinois v.
    Wolf*, 461 F. Supp. 3d 779, 788-89 (N.D. Ill. 2020); *CASA de Maryland, Inc. v. Trump*,
24  355 F. Supp. 3d 307, 325 (D. Md. 2018); *Centro Presente v. United States Dep't of
    Homeland Sec.*, 332 F. Supp. 3d 393, 412 (D. Mass. 2018).
25

26      [7] *See United States v. Machic-Xiap*, --F. Supp. 3d. --, Case No. 3:19-cr-407-SI,
    2021 WL 3362738, at *10-16 (D. Or. Aug. 3, 2021) (applying *Arlington Heights* to an equal
27  protection challenge to § 1326); *United States v. Wence*, Case No. 3:20-cr-0027, 2021
    WL 2463567, at *2-4 (D.V.I. Jun. 16, 2021) (same). *But see United States v. Gutierrez-
28  Barba*, Case No. CR-19-01224-001-PHX-DJH, 2021 WL 2138801, at *5 (D. Ariz. May 25,
    2021) (applying rational-basis review after construing defendant's challenge as relating
    to alienage).

5

Under *Arlington Heights*, the moving party has the burden of demonstrating: (1) disparate impact;[8] and (2) that "racially discriminatory intent or purpose" was a "motivating factor in the decision." 429 U.S. at 265-68. Determining discriminatory intent requires a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available," including, but not limited to: "[t]he historical background of the decision"; "[t]he legislative or administrative history"; "[t]he specific sequence of events leading to the challenged action"; "[d]epartures from normal procedural sequence"; or whether the impact of the law "bears more heavily on one race than another." *Id.* at 266-68. If the movant demonstrates that a racially discriminatory intent or purposes was a motivating factor in the challenged decision, the burden then shifts to the government to establish that "the same decision would have resulted even had the impermissible purpose not been considered." *Id.* at 270 n. 21.

Before Section 1326 was enacted in 1952, Congress first criminalized unlawful reentry in 1929 as part of the Undesirable Aliens Act ("the Act of 1929").[9] *See* Act of Mar. 4, 1929, Pub. L. No. 70-1018, ch. 690, 70 Congress, 45 Stat. 1551 (1929). The Immigration and Nationality Act of 1952 ("INA"), often referred to as The McCarran-Walter Act ("McCarran-Walter Act"), again codified the unlawful reentry provision first passed in 1929 under Title 8 of the United States Code, at 8 U.S.C.A. § 1326.[10] Section 1326 was

---

[8]The Court opined that "disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination." *Id.* (quoting *Washington v. Davis,* 426 U.S. 229, 242 (1976)).

[9]In relevant part, the statute reads: "That (a) if any alien has been arrested and deported in pursuance of law, he shall be excluded from admission to the United States whether such deportation took place before or after the enactment of this act, and if he enters or attempts to enter the United States after the expiration of sixty days after the enactment of this act, he shall be guilty of a felony and upon conviction thereof shall, unless a different penalty is otherwise expressly provided by law, be punished by imprisonment for not more than two years or by a fine of not more than $1,000 or by both such fine and imprisonment." Undesirable Aliens Act, Pub. L. No. 70-1018, ch. 690, 45 Stat. 1551 (1929).

[10]The recodified statute reads: "Any alien who—(1) has been arrested and deported or excluded and deported, and thereafter (2) enters, attempts to enter, or is at

6

subsequently amended in 1988, 1990, 1994, and 1996, always to increase its deterrent value.[11]

_____

any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously excluded and deported, unless such alien shall establish that he was not required to obtain such advance consent under this or any prior Act, shall be guilty of a felony, and upon conviction thereof, be punished by imprisonment of not more than two years, or by a fine of not more than $1,000, or both." Immigration and Nationality Act, Pub. L. No. 82-414, § 276, 66 Stat. 229 (codified at 8 U.S.C. § 1326 (1952)).

[11]Section 1326 was first amended in the Anti-Drug Abuse Act of 1988 by adding subsection (b) which created increased penalties for those with prior felony convictions. *See* Pub. L. 100-690, title VII § 7345(a), 102 Stat. 4471 (Nov. 18, 1988) (codified at 8 U.S.C. § 1326 (1988)). The new Section 1326(b) provided that a person with a prior felony conviction who reenters may be imprisoned up to five years, and a person with an aggravated felony conviction may be imprisoned up to 15 years.

In 1990, the Immigration Act of 1990 removed the $1,000 cap and authorized greater fines under Title 18. *See* Pub. L. 101-649, title V § 543(b)(3), 104 Stat. 5059 (Nov. 29, 1990).

In 1994, the Violent Crime Control and Law Enforcement Act of 1994 again increased penalties for violating Section 1326 and included those with misdemeanor convictions in the heightened penalty category. *See* Pub. L. 103-322, title XIII § 130001(b), 108 Stat. 2023 (Sept. 13, 1994) (codified at 8 U.S.C. § 1326 (1994)). Specifically, the 1994 Amendments increased the imprisonment time for those with a prior felony conviction from up to five years to up to 10 years, and for those with a prior aggravated felony conviction from up to 15 years to up to 20 years. The amendment also included persons with "three or more misdemeanors involving drugs, crimes against the person, or both" in the group with the penalty of up to 10 years imprisonment. Finally, the amendment broadened the definition of 'deportation' to include "any agreement in which an alien stipulates to deportation during a criminal trial under either Federal or State law." *Id.*

In 1996, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") again amended Section 1326. Pub. L. 104-132, title IV §§ 401(c), 438(b), 441(a), 110 Stat. 1267-68, 1276, 1279 (Apr. 24, 1996) (codified at 8 U.S.C. § 1326 (2000)). AEDPA added subsections (c) and (d) to Section 1326. Subsection (c) mandates incarceration for any person who reenters after they were deported by judicial order, and subsection (d) limits collateral attack of the underlying deportation order. The AEDPA amendments also added § 1326(b)(3), which allowed persons excluded from entry under § 1225(c) to be imprisoned for a period of 10 years, which may not be served concurrently with any other sentence.

Again in 1996, as part of the Omnibus Consolidated Appropriations Act of 1997, Congress added a fourth paragraph to § 1326(b). *See* Pub. L. 104-208, div. C title III §§ 305(b), 308(d)(4)(J), 308(e)(1)(K), 308(e)(14)(A), 324(a), 324(b); 110 Stat. 3009-606, 3009-618 to 3009-620, 3009-629 (Sept. 30, 1996). Section 1326(b)(4) added a penalty for persons convicted of nonviolent offenses who had been removed while on parole, supervised release, or probation, who then reenter. The penalty is up to 10 years'

7

1    Carrillo-Lopez relies on the *Arlington Heights* factors to argue that racial animus—

2    as evidenced through the historical background, legislative history, sequence of events

3    leading up to passage—was, at minimum, a motivating factor in the passage of Section

4    1326 that disparately impacts Mexican and Latinx individuals. That racial animus would

5    make Section 1326 presumptively unconstitutional under *Arlington Heights*. (ECF No. 26

6    at 2.) The government responds that "even assuming Congress's 1929 illegal reentry law

7    was wholly the result of impermissible racial animus, well-established doctrine holds that

8    such legislative history would have no bearing on the law enacted by a subsequent

9    Congress in 1952." (ECF No. 29 at 2.)

10   First, the Court finds that Section 1326 does indeed disparately impact Mexican

11   and Latinx individuals. The Court further finds, as other district courts have, that

12   discriminatory intent motivated the criminal unlawful reentry statute in 1929.[12] But the

13   Court further concludes the evidence Carrillo-Lopez provides demonstrating the animus

14   which tainted the Act of 1929, along with other proffered evidence contemporaneous with

15   the INA's enactment in 1952, is sufficient for Carrillo-Lopez to meet his burden that

16   discriminatory intent was a motivating factor of both the 1929 and 1952 enactments.

17   Because the Court finds Carrillo-Lopez has met his burden under *Arlington*

18   *Heights*, the burden shifts to the government to prove that the statute would have passed

19   even if the impermissible purpose had not been considered. Because the government

20   fails to provide sufficient evidence to meet its burden, the Court will grant the Motion.

21                    **1.    Disparate Impact on Latinx Individuals**

22   The Court determines first that Section 1326 disparately impacts Latinx individuals.

23   In some "rare" instances, there is a "clear pattern unexplainable on grounds other than

24

---

25   imprisonment and a fine. These amendments also further broadened the scope of
26   persons to which Section 1326 applied by replacing the 1994 definition of deportation with
     'removal,' which "includes any agreement in which an alien stipulates to removal during
     (or not during) a criminal trial under with Federal or State law." *Id.*
27

28   [12] *See, e.g.*, *Machic-Xiap*, 2021 WL 3362738 at *1 ("[T]he Court finds that racism
     has permeated the official congressional debate over United States immigration laws
     since the late 19th and early 20th centuries, including the 1929 Act.")

8

race" that a statute would affect some groups and not others, but "absent a pattern [of disparate impact] as stark as that in *Gomillion* or *Yick Wo*, impact alone is not determinative, and the Court must look to other factors." 429 U.S. 252 at 266. Carrillo-Lopez acknowledges, and in fact does not contend, that disparate impact alone in this case is enough to meet his burden. Rather, he proffers evidence of both disparate impact and discriminatory intent to meet his burden under *Arlington Heights.* The Court finds he has met his burden as to both.

Carrillo-Lopez argues, convincingly, that Section 1326 disparately impacts Mexican and Latinx defendants. (ECF No. 26 at 20.) While no publicly available data exists as to the national origin of those prosecuted under Section 1326, over 97% of persons apprehended at the border in 2000 were of Mexican decent, 86% in 2005, and 87% in 2010. (*Id.* (citing *U.S. Border Patrol Nationwide Apprehensions by Citizenship and Sector, 2007-2019* (URL omitted).) In lieu of prosecution data, Carrillo-Lopez argues that immigration policy under President Trump and Department of Justice directives to prosecuting attorneys demonstrate that many, if not all, apprehensions are ultimately prosecuted.[13] Carrillo-Lopez then compares the data to other successful challenges under *Arlington Heights* to show that they meet the necessary standard of disproportionality. (*Id.*)

Importantly, the government does not dispute that Section 1326 bears more heavily on Mexican and Latinx individuals. Instead, the government attributes that impact to other causes—geography and proportionality. Specifically, the government argues that the stated impact is "a product of geography, not discrimination"[14] and the statistics are

---

[13]"The Department of Homeland Security is now referring 100 percent of illegal Southwest Border crossings to the Department of Justice for prosecution. And the Department of Justice will take up those cases." (ECF No. 26 at 20-21 (citing U.S. Dep't of Justice, Statements of AG Sessions (Apr. 6, 2018) (URL omitted)).)

[14]"Those numbers are neither surprising nor illuminating of Congress's motives in the 1920s. Indeed, if it were enough to state an equal protection claim that a broad-scale immigration law disparately affected individuals of any particular ethnicity—including those from a country sharing 1,954 miles of border with the United States—virtually any

1  rather "a feature of Mexico's proximity to the United States, the history of Mexican
2  employment patterns, and other socio-political and economic factors that drive migration
3  from Mexico to the United States–not discrimination." (ECF No. 29 at 13, 25 (citing
4  *Regents,* 140 S. Ct. at 1915-16).) As to "proportionality" it argues that "it makes sense
5  that Mexican citizens comprised a high percentage of illegal entry defendants, given the
6  suggestion that they made up a disproportionately high percentage of the overall illegal
7  alien population." (ECF No. 29 at 14.) The Court is not persuaded.

8          First, the test for disparate impact only requires evidence that Section 1326 "bears
9  more heavily on one race than another," a much less stringent standard than the
10  government suggests. (ECF No. 30 at 12 (citing *Arlington Heights,* 429 U.S. at 266).)
11  Carrillo-Lopez has met this standard by showing that Section 1326 bears more heavily
12  on Mexican and Latinx individuals. From 1929 to 1939, the number of border crossing
13  crimes increased substantially, making up anywhere from 84% to 99% of defendants."
14  (ECF No. 26 at 17.) Over the course of a decade, well over 80% of border crossing
15  apprehensions were those of Mexican or Latinx heritage.[15] These numbers are in line
16  with other successful *Arlington Heights* challenges. *See Ave. 6E Investments, LLC v. City
17  of Yuma, Ariz.,* 818 F.3d 493, 505-06 (finding disparate impact where a concentration of
18  most low-income housing is in neighborhoods that are 75% Hispanic); *Arce v. Douglas,*
19  793 F.3d 968, 977 (9th Cir. 2015) (finding disparate impact where 90% of enrollees at a
20  targeted program were of Mexican or Hispanic origin); *The Comm. Concerning Cmty.
21  Improvement v. City of Modesto*, 583 F.3d 690, 704 (9th Cir. 2009) (finding disparate
22  impact where 71% of Latino areas were excluded from benefits while extending benefits
23  to areas that were only 48% Latino).

24

25  such law could be challenged on that ground." (ECF No. 29 at 13 (citing *Regents,* 140 S.
26  Ct. at 1915-16).)

27          [15]And as noted, those apprehensions are being prosecuted. *See* U.S. Dep't of
   Justice, Statements of AG Sessions (Apr. 6, 2018) (URL omitted) ("The Department of
28  Homeland Security is now referring 100 percent of illegal Southwest Border crossings to
   the Department of Justice for prosecution. And the Department of Justice will take up
   those cases.").

The government also attempts to use the Supreme Court's reasoning in *Regents* to support its proportionality argument, but that reliance is misplaced.[16] In *Regents,* the Court found that disparate impact *alone* had not been demonstrated. But, as discussed above, Carrillo-Lopez does not attempt to meet his burden on disparate impact alone, but through a showing of disparate impact coupled with intent. Because the Court in *Regents* found that the plaintiffs had failed to demonstrate discriminatory intent, whereas this Court ultimately finds that Carrillo-Lopez has demonstrated both a disparate impact along with discriminatory intent, *Regents* is inapposite.

Second, the Court is unpersuaded by the government's argument that geography explains disparate impact. As Carrillo-Lopez notes (ECF No. 30 at 13-14), the Ninth Circuit has previously found disparate impact in situations where "geography" might arguably explain the disparity. *See Comm. Improvement,* 583 F.3d at 704-06 (finding that planning decisions made with racist purpose in predominantly Latino neighborhoods disparately impacts Latino people); *Arce,* 793 F.3d at 978 (finding that education decisions with racist purpose in Latino city has disparate impact on Latino students); *D.N.C. v. Hobbs,* 948 F.3d 989, 1004-06 (9th Cir. 2020) (en banc) (finding that voting decisions with racist purpose in state where American Indian, Latino, and Black neighborhoods have limited transit and mail access disparately impacts those communities). Moreover, the government's argument is circular and inconclusive. It cannot be the case that the mere over-policing of certain locations—here the Southern border as opposed to the Northern border—prevents a specific group from raising equal protection challenges. Or that because Mexican citizens will likely make up more unlawful reentries because they are a higher percentage of the overall illegal alien population, they cannot raise equal protection challenges. Ultimately, the law still bears more heavily on

---

[16] In *Regents*, the Court reasoned that "because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program. Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds." 140 S. Ct. at 1915.

11

1  those individuals than others, which is the standard that Carrillo-Lopez has met here. The

2  Court accordingly finds that Section 1326 disparately impacts Latinx individuals.

3          **2.**        **The Act of 1929 was first enacted with a racially discriminatory**

4                      **purpose.**

5        In his Motion and at the subsequent Oral Argument and Hearing, Carrillo-Lopez

6  submitted significant evidence of the non-exhaustive factors outlined in *Arlington Heights*

7  to argue that the Act of 1929 was passed with discriminatory intent. The government

8  ultimately conceded that discriminatory intent motivated the passage of the Act of 1929.[17]

9  But because the background of the Act of 1929 is relevant to the eventual passage of

10  Section 1326 in 1952, and because the 1952 Congress adopts language from the Act of

11  1929 almost word for word, the Court will address each of the proffered *Arlington Heights*

12  factors as they relate to the 1929 statute. The Court concludes, as did both parties, that

13  Carrillo-Lopez presents sufficient evidence to demonstrate the Act of 1929 was motivated

14  by racial animus.

15                      **a.**      **Historical Background**

16        *Arlington Heights* permits courts to consider "the historical background of the

17  decision." 429 U.S. at 265-68. Carrillo-Lopez first explains how immigration legislation

18  and racism were intimately entwined in the 1920s. Kelly Lytle Hernández, Professor of

19  History at the University of California, Los Angeles, gives context to that history through

20  a sworn declaration in which she testifies that "the criminalization of unauthorized entry

21  was a racially motivated act." (ECF Nos. 26-2 at 2; 49). Professor Lytle Hernández

22  provided context for the passage of the Act of 1929, explaining that the legislation came

23  on the heels of the National Origins Act of 1924 which "narrow[ed] the pathways of legal

24  immigration" by reserving 96 percent of all quota slots for European immigrants. (ECF

25

26         [17]At Oral Argument, the government's counsel stated: "I would say that, yes, the

27  statements from those legislators would be sufficient were we considering the 1929 law, but we're not." (ECF No. 47 at 38.) The Court asked for confirmation—"so you agree that

28  they've offered enough evidence to demonstrate that the 1929 enactment stems from racial animus under *Arlington Heights*"—to which the government's counsel responded, "Yes, your Honor." (*Id.* at 38-39.)

1   No. 26-2 at 4.) But the National Origins Act exempted immigrants from the Western

2   Hemisphere, in part due to pressures from American industry who relied on Mexican

3   labor. (*Id.*) Nativists and proponents of eugenics argued against this exemption.

4       At the Hearing, Professor Lytle Hernández emphasized how racial animus

5   "bec[am]e more intense" heading into the 1920s, a period referred to as the "Tribal

6   Twenties," when nativism and eugenics became more widely accepted and began to

7   impact Congressional immigration proposals. (ECF Nos. 49 at 27-28; 26-2 at 5 ("[T]he

8   Nativists in Congress never gave up their quest to end Mexican immigration to the United

9   States. After the passage of the 1924 Immigration Act, they proposed bill after bill

10  attempting to add Mexico to the quota system. Between 1926 and 1930, Congress

11  repeatedly debated the future of Mexican immigration into the United States.").)

12  Additionally, and among other things, Professor Lytle Hernández also addressed the

13  "Juan Crow regime" that developed in the 1920s, "a racialized subjugation system in place

14  that mirrors what [was] happening in the American South." (ECF No. 49 at 32.)

15              **b.    Sequence of Events and Legislative History**

16      Courts may also consider "the specific sequence of events leading to the

17  challenged action." *Arlington Heights,* 429 U.S. at 265-68. Professor Lytle Hernández

18  again provided insight into the events surrounding the passage of the Act of 1929, notably

19  the National Origins Act of 1924 which established a quota system based on national

20  origin that specifically exempted immigrants from the Western Hemisphere, including

21  Mexicans. (ECF No. 49 at 27-28.) This exemption resulted in a "pretty rapid turn to

22  focusing on getting Mexican immigrants included on the quota," with two major pieces of

23  legislation attempted in 1926 and 1928, but both protested by "major employers and

24  industries across the west" who were "concerned that they w[ould] be cut off from access

25  to Mexican workers." (*Id.* at 28-30.) Professor Lytle Hernández explained that while

26  employment lobbies won initially, "the nativists [were] furious in Congress . . . so [sought]

27  to pursue this through other means" which ultimately led to the Act of 1929 which

28  criminalizes unlawful entry and reentry." (*Id.* at 28-29.) She concludes that it is her

13

1    "professional opinion" that "the illegal reentry provision of the 1929 law was intended to

2    target Latinos." (ECF No. 49 at 34.)

3         Relatedly, the Court may consider "the relevant legislative or administrative

4    history." 429 U.S. at 265-68. Here, Carrillo-Lopez argues that legislative history "easily

5    clears the low threshold of showing that racism and eugenics were a 'motivating factor' .

6    . ." (ECF No. 26 at 15.) While there was little discussion or debate prior to the Senate's

7    passage of the Act of 1929, the bill was introduced after prior attempts failed. Carrillo-

8    Lopez argues these prior failed attempts clearly indicate racial animus. For example, a

9    House Committee on Immigration and Naturalization hearing on "The Eugenical Aspects

10   of Deportation" included testimony from principal witness Dr. Harry H. Laughlin, a well-

11   known eugenicist who suggested that "immigration control is the greatest instrument

12   which the Federal Government can use in promoting race conservation of the Nation"

13   (ECF No. 26-3 at 11, 19), and compared drafters of deportation laws to "successful

14   breeders of thoroughbred horses" (*id.* at 44). Chairman of the House Immigration and

15   Naturalization Committee, Representative Albert Johnson, then advocated for

16   Congress's use of "the principle of applied eugenics" to reduce crime by "debarring and

17   deporting" people. (*Id.* at 25.) These remarks and earlier debates were essentially

18   incorporated into the 1929 discussion because after the initial legislation failed, a

19   compromise was brokered with the agricultural industry and the bill was resubmitted and

20   quickly passed from the Senate to the House. (ECF Nos. 26 at 14; 26-9 at 2-3; 26-10 at

21   2 (passed full Senate with relatively little debate, but when presented, Senator Blease

22   remarks that he was "asked to get the measures over to the house [within two days] if I

23   possibly could"); 26-11 at 2-3 (report submitted from the Committee of Immigration and

24   Naturalization to the full House, reading: "the hearings in the Sixty-ninth Congress on the

25   subject matter contained in the bill were exhaustive. Much important testimony was

26   developed.") During debate on the bill in the House, representatives made similar racist

27   remarks, including testimony from Representative Fitzgerald who argued that Mexicans

28

14

1    were "poisoning the American citizen" because they were of a "very undesirable" class.

2    (ECF No. 26-4 at 8.)

3                    **c.    Departure from Normal Substantive Considerations**

4           The next *Arlington Height's* factor a court can consider is "the legislature's

5    departure[] from normal procedures or substantive conclusions." 429 U.S. at 265-68.

6    Here, Carrillo-Lopez argues that the "1920s was the first and only era in which Congress

7    openly relied on the now discredited theory of eugenics to enact immigration legislation,"

8    with illegal reentry laws as one of "few laws still in effect from that era." (ECF No. 26 at

9    16.) Further, the discussions departed from typical conclusions underlying immigration

10   law because the "racial vitriol expressed during the debates was directed almost

11   exclusively at Mexicans—even though Canadians were also entering the United States

12   in record numbers." (*Id.* (citing ECF No. 26-4 at 9.))

13          Taking these factors into account, the Court is persuaded that Carrillo-Lopez has

14   proffered sufficient evidence under the *Arlington Heights* framework to demonstrate that

15   racial animus was a strong motivating factor in the passage of the Act of 1929. The

16   evidence clearly indicates, as both parties and other district courts agree, that the Act of

17   1929 was passed during a time when nativism and eugenics were widely accepted, both

18   in the country at large and by Congress, and that these racist theories ultimately fueled

19   the Act's passage.

20          **3.    The 1952 reenactment did not cleanse Section 1326 of its racist**

21                  **origins and was also motivated by discriminatory intent.**

22          The government argues that evidence relating to the Act of 1929 has "no bearing

23   on the passage of the law [Carrillo-Lopez] actually challenges."[18] (ECF No. 29 at 15.)

24   Instead, the government argues that reenactment of an existing law, in the absence of

25

26

27          _____
             [18]The original briefs on the Motion focused on the Act of 1929. (ECF Nos. 26, 29,
28   30.) Following the Hearing, the Court ordered post-hearing briefing specifically
     addressing the question of whether the racial animus motivating the Act of 1929 tainted
     the statute's reenactment in 1952 through the INA. (ECF Nos. 50, 51.)

                                                 15

discriminatory intent, cleanses the law of prior discriminatory motivation.[19] (ECF No. 51 at 4-5.) The government there argues that the history of 1929 is therefore irrelevant to the Court's inquiry under *Arlington Heights* and the Court must limit its attention to the passage of the INA in 1952.

Carrillo-Lopez counters that "the absence of any repudiation of the racial animus that led to the adoption of the statute in 1929 should be construed as the defendant meeting his burden."[20] (ECF No. 50 at 5.) But in the alternative, Carrillo-Lopez argues that he exceeds his burden by further demonstrating that the 1952 Congress not only remained silent, but repeatedly recodified Section 1326 with more punitive measures with knowledge of the law's disparate impact, over a presidential veto addressing the bill's racism, and at a moment in history when Congress was simultaneously passing other legislation disparately impacting Latinx migrants. (ECF No. 50 at 1-2.) The Court will therefore consider whether the racial animus exhibited in the Act of 1929's passage can and did infect Section 1326's enactment in 1952.

While the Court might be persuaded that the 1952 Congress' silence alone is evidence of a failure to repudiate a racially discriminatory taint, the Court need not decide that issue. Instead, the Court finds the evidence that racial animus motivated the Act of 1929 is relevant to the 1952 *Arlington Heights* inquiry in two ways. First, evidence from the 1929 Congress is relevant as historical background for the passage of the INA in 1952. *See Machic-Xiap*, 2021 WL 2021 WL 3362738 at *12 (finding the history of the 1929 statute "strong" historical background evidence). The Court incorporates by reference this prior evidence as evidence of the historical background motivating the passage of Section 1326 in 1952. The Court will further explain below how the other

---

[19]The government relies specifically on the Supreme Court's decision in *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018), and three circuit courts of appeals decisions, *see Hayden v. Paterson*, 594 F.3d 150, 164-68 (2d Cir. 2010); *Johnson v. Governor of State of Florida,* 405 F.3d 1214, 1223-26 (11th Cir. 2005) (en banc*); Cotton v. Fordice,* 157 F.3d 388, 391-92 (5th Cir. 1998).

[20]Specifically, codifications are "either responsive, i.e. reverse[] a prior piece of legislation, or [are] extensive, that is, passed in the context of knowing what the existing statute means and is intended to do, and builds on that." (*Id.*)

1    *Arlington Heights* factors also support the finding that Section 1326's enactment was

2    motivated at least in part by discriminatory intent.

3         But second, the Court finds the government is incorrect in its reliance on *Abbott*,

4    because a prior version of a statute known to be motivated by racial animus may be

5    considered as infecting its present iteration if it was not, in fact, substantially altered. *See*

6    *Hunter*, 471 U.S. 222, 232-33 (1985) (finding that when a statute's original enactment

7    was clearly motivated by racial animus, later amendments did not "legitimate[]" the

8    provision); *see also Abbott*, 138 S. Ct. at 2324-25 (distinguishing its holding from *Hunter*

9    because the statute in *Abbott* was substantially different from its predecessor and there

10   was no evidence that the reenacting legislature "carried forward the effects of any

11   discriminatory intent"). After the Court addresses the 1952-specific evidence, the Court

12   will explain why the 1952 Congress cannot be presumed to have cured the animus

13   present in 1929.

14        In light of these reasons, the Court considers that the totality of the evidence

15   demonstrates racial animus motivated the 1952 enactment of Section 1326, regardless

16   of whether silence alone would have been sufficient to demonstrate discriminatory

17   intent.[21]

18              a.    **The 1952 enactment of Section 1326 was also motivated**

19                    **by discriminatory intent.**

20        The Court does not rely solely on the evidence from 1929, but also considers

21   contemporaneous evidence from 1952. In evaluating that evidence, the Court looks at the

22   interplay between legislative history and relevant historical evidence. Specifically, the

23

24              [21]The Court notes that the authority the government relies upon specifies that
     courts must presume legislatures act in good faith in redistricting cases. *See Abbott*, 138
25   S. Ct. at 2324 (""[I]n assessing the sufficiency of a challenge *to a districting plan*,' a court
     'must be sensitive to the complex interplay of forces that enter a legislature's redistricting
26   calculus . . . [a]nd the 'good faith of [the] state legislature must be presumed.'") (citing
     *Miller v. Johnson*, 515 U.S. 900, 915-16 (1995)). Both *Miller* and *Abbott* emphasize the
27   complexity of redistricting in the need for presumption of legislative good faith. The Court
     is not convinced that reasoning is analogous to this comparatively less complex statutory
28   scheme, especially when animus has been demonstrated and the reenacted statute is
     nearly identical to its improper predecessor.

                                              17

1  Court considers: a relative lack of discussion compared to robust Congressional debate

2  regarding other provisions of the INA; explicit, recorded use of the derogatory term

3  "wetback" by supporters of Section 1326; Congressional silence while increasingly

4  making the provision more punitive; Congress' failure to revise in the face of President

5  Truman's veto statement calling for a reimagination of immigration policy; knowledge of

6  the disparate impact of Section 1326 on Mexican and Latinx people; and passage of the

7  so-called "Wetback Bill" by the same Congress only months prior. The Court recognizes

8  that this evidence is circumstantial, and that each instance may not be as probative when

9  considered alone. But in its totality, the cited evidence is sufficient to demonstrate that

10 racial animus was at least one motivating factor behind the enactment of Section 1326.[22]

11 The evidence specific to the 1952 enactment will be discussed in turn.

### i.  Silence Compared to Robust Debate on Other Provisions

13     As stated above, the Court does not now determine if silence alone is enough for

14 Carrillo-Lopez to meet his burden. But the Court does consider whether a lack of debate

15 regarding recodification of Section 1326 in 1952, when other provisions of the INA were

16 debated and discussed, supports Carrillo-Lopez's argument that discriminatory intent was

17 a motivating factor in its reenactment in 1952. The Court finds that it does.

18     Defense expert Professor Gonzalez O'Brien testified that the contrast between

19 extensive congressional debate about other national origin provisions and the

20 comparative lack thereof around Section 1326 suggests an acceptance of its history.

21 (ECF No. 49 at 181.) Other instances of discriminatory immigration policy, Professor

22 Gonzalez O'Brien notes, prompted the Congress to debate about what was deemed a

23 problematic aspect of the original enactment—including during the 1952 enactment of the

24

---

25     [22]The Court notes that a recent district court decision from this circuit disagrees.
*See Machic-Xiap*, 2021 WL 3362738 at *11-14. After considering the same evidence that
26 is now before the Court—Truman's veto statement, the letter from DAG Ford, testimony
from Professors Gonzalez O'Brien and Lytle Hernández—the court in that case found
27 that the legislative history of Section 1326 is "inconclusive." *Id.* at *13. But this Court
cannot agree that the evidence, when viewed in its totality, is insufficient to demonstrate
28 that racial animus was at least one motivating factor for the passage of Section 1326. The
Court explains its reasoning more fully below.

1    INA.[23] (*Id.* at 180.) Professor Gonzalez O'Brien concludes "that's one of the reasons that

2    I'm willing to say that this is a demonstration of racial—of continued racial animus, is that

3    you're acknowledging in the debate over the McCarran-Walter Act, members of Congress

4    are acknowledging that there are problematic racial aspects to the 1924 Johnson-Reed

5    Act, which comes five years before the Undesirable Aliens Act, and yet they choose to

6    not only recodify the 1326, but to recodify it[] without any examination." (ECF No. 49 at

7    180-81.)

8    Professor Gonzalez O'Brien's testimony depicts a Congress that was more

9    concerned with which racial and ethnic groups warranted continued discriminatory

10   exclusion, rather than any desire to confront or revise the nativism reflected in the Act of

11   1929. As a matter of logic, the 1952 Congress could have either examined that history or

12   ignored it. If the 1952 Congress ignored the express nativist intent behind the Act of 1929,

13   there is no reason to assume that the later enactment arose from some wholly unrelated

14   motivation cleansed from discriminatory intent. If it did not ignore the Act of 1929's history,

15   there was opportunity to either adopt its racial animus or refute its improper motivation

16   and clarify a purpose for the statute that did not violate the Equal Protection Clause. Here,

17   the 1952 Congress remained silent, even when other provisions of the law were being

18   debated. When considered in comparison with the express debate over other racially

19   problematic predecessor statutes, Congress' silence here weighs in favor of establishing

20   Carrillo-Lopez meets his burden.

21   ///

22   ///

23

24   [23]In particular, Professor Gonzalez O'Brien notes the continued debate over the use (and allocation) of quotas in the immigration scheme: "we see that debate with the McCarran-Walter Act, I mean the debate over national origins, and the kind of racial

25   aspects of the, of the limits placed on quotas for southern and eastern Europeans. . . you see the continuation of that with the McCarran-Walter Act, and the insertion of tables

26   during committee testimony, the insertion of tables showing that the largest quotas will still go to northern and western Europeans." (ECF No. 49 at 180.) He goes on to note that

27   "in 1965 with debate over the Hart-Celler Act, and the elimination of national quotas and the acknowledgement that the national quota system had been one that was very clearly

28   and explicitly meant to privilege certain groups based on perceptions of superiority and inferiority, particularly—you know, especially with 1924." (*Id.*)

19

### ii. President Truman's Veto

The Court also considers that Congress declined to comment on the racist forebears of Section 1326, even in the face of President Truman's veto of the INA. On June 25, 1952, President Truman vetoed INA, and included a veto statement. (ECF No. 44-1.) President Truman condemned the INA as "legislation which would perpetuate injustices of long standing against many other nations of the world" and "intensify the repressive and inhumane aspects of our immigration procedures." (*Id.* at 3.) Finding that the positive aspects of the INA were "heavily outweighed" by other provisions, President Truman expressed dismay that so much of the INA "would continue, practically without change" discriminatory practices first enacted in 1924 and 1929. (*Id.* at 4.)

On June 27, Congress overrode President Truman's veto and passed the INA. (*Id.*) Carrillo-Lopez argues that Congress' decision to pass the INA over a presidential veto that "explicitly called out the law for its racism" is evidence of racial animus. (ECF No. 50 at 5-6.) While President Truman did not explicitly address racism as to Mexican or Latinx individuals, he commented on the negative implications of expanding the grounds for deportation,[24] and implored Congress to reconsider the INA's passage: "Should we not undertake a reassessment of our immigration policies and practices in the light of the conditions that face us in the second half of the twentieth century? . . . I hope the Congress will agree to a careful reexamination of this entire matter." (ECF No. 44-1 at 10.) President Truman clearly wanted Congress to review the INA and reconsider its objectives, admonishing it was "the time to shake off this dead weight of past mistakes . . . time to develop a decent policy of immigration—a fitting instrument for our foreign policy and a

---

[24]President Truman specifically criticized the "unnecessarily severe" and inflexible penalties for deportation. (*Id.* at 8.) He continued, "[t]he bill would sharply restrict the present opportunity of citizens and alien residents to save family members from deportation. Under the procedures of present law, the Attorney General can exercise his discretion to suspend deportation in meritorious cases. In each such case, at the present time, the exercise of administrative discretion is subject to the scrutiny and approval of the Congress. Nevertheless, the bill would prevent this discretion from being used in many cases where it is now available and would narrow the circle of those who can obtain relief from the letter of the law. This is most unfortunate, because the bill, in its other provisions, would impose harsher restrictions and greatly increase the number of cases deserving equitable relief." (*Id.* at 9.)

20

1  true reflection of the ideals we stand for, at home and abroad . . ." (*Id.* at 6.) Professor

2  Gonzalez O'Brien confirms that despite the fact that the INA is "sometimes characterized

3  as racially progressive," President Truman's veto "explicitly notes" the INA was

4  unnecessarily punitive, and inequitably so. (ECF No. 49 at 116-117.)

5      As another court noted, the veto statement largely objected to the national origin

6  quota system, not Section 1326. *See Machic-Xiap*, 2021 WL 3362738, at *13. But

7  although President Truman did not address Section 1326 specifically, the veto statement

8  represents in no uncertain terms a contemporary admonishment of an overly punitive and

9  discriminatory immigration policy. Truman expressly drew the INA into dialogue with prior

10  immigration legislation, from both 1924 and 1929, which were concededly racist. But the

11  1952 Congress rejected that call and overrode the veto. The Court finds that Congress'

12  failure to heed President Truman's call to "reimagine" immigration while simultaneously

13  making the INA, and particularly Section 1326, more punitive in nature, is evidence of at

14  least indifference to the nativist motivations of the statute's predecessor. The Court

15  accordingly finds that Congress' decision to proceed with the INA that President Truman

16  denounced as discriminatory contributes to its finding that Carrillo-Lopez has met his

17  burden.

18              **iii.  Deputy Attorney General Peyton Ford Letter**

19      The Court considers additional legislative history—a letter of support from Deputy

20  Attorney General Peyton Ford, which includes use of the racially derogatory word

21  "wetback" as well as testimony in support of expanding the grounds for prosecution and

22  conviction of unlawful reentry under Section 1326. On May 14, 1951, Attorney General

23  Ford wrote to Pat McCarran, Chairman of the Committee on the Judiciary, in "response

24  to [McCarran's] request for the views of the Department of Justice relative to the bill (S.

25  716) to revise the laws relating to immigration, naturalization, and nationality; and for other

26  purposes . . ." (ECF No. 44-2.) Congress' decision to adopt this recommendation, the only

27  substantive change made to Section 1326 in 1952, in light of its silence regarding all other

28  aspects of the provision, is further evidence of racial animus.

First, Attorney General Ford's letter expressly includes the racial slur "wetback." The letter specifically quotes from the report of the President's Commission on Migratory Labor, Migratory Labor in American Agriculture, March 26, 1951, which says: "Statutory clarification on the above points will aid in taking action against the conveyors and receivers of the *wetback*. These clarifications of the statute, together with increased funds and personnel for enforcement, are possibly all that are needed to deal effectively with the smuggler and the intermediary." (ECF No. 44-2 at 9 (emphasis added).) Common sense dictates, and many courts have acknowledged, that the term "wetback" is racist.[25] *See, e.g.*, *Machic-Xiap*, 2021 WL 3362738, at *13 ("Again, 'wetback' is a racial epithet."). Its use in testimony from a supporter of the bill is significant here. First, it evidences the racial environment and rhetoric in 1952, even among high-ranking government officials and committees, specifically with regard to Mexican and Latinx people. But it is also significant considering that Ford's recommendation was the only recommendation adopted by Congress as to Section 1326. Not only does Ford's letter employ racially derogatory language, but it advises Congress to expand the grounds for deportation. Specifically, the letter recommended amendments to the bill including clarifying the "found in" clause in Section 276 by:

> add[ing] to existing law by creating a crime which will be committed if a previously deported alien is subsequently found in the United States. This change would overcome the inadequacies in existing law which have been observed in those cases in which it is not possible for the Immigration and Naturalization Service to establish the place of reentry, and hence the proper venue, arising in prosecutions against a deported alien under the 1929 act.

---

[25] Professor Gonzalez O'Brien goes on to explain that "the term with 'wetback' comes from the idea that individuals who are entering without inspection have to do so at an area where there is no bridge over the Rio Grande River and, therefore, they get wet and, therefore, the term wetback. But across the period of the 1940s and 1950s, this term has—is associated, and almost synonymous with Mexicans. And in addition to being synonymous with Mexicans and racialized in much the same way, it also has the attribution of a lot of the negative stereotypes that were associated with Mexican immigrants in the push, or [sic] quotas to be applied to immigration from Mexico and south of the Rio Grande, as well as during debate over the Undesirable Aliens Act." (ECF No. 49 at 89-90.)

1    (ECF No. 44-2 at 7.)

2          At the Hearing, Professor Gonzalez O'Brien explained that this amendment was

3    incorporated "explicitly to make it easier to enforce the 1929 law, by allowing prosecution

4    of immigrants wherever they were found, even if you couldn't establish where they

5    crossed." (ECF No. 49 at 184-85). This legislative history confirms, as Carrillo-Lopez

6    argues, that the only substantive change made to Section 1326 in 1952 was this

7    amendment which expanded the government's authority to enforce the original 1929

8    provision, thereby making Section 1326 more punitive in nature. Attorney General Ford's

9    recommendation, conveyed to Congress along with racial slurs, was adopted by the 1952

10   Congress and became a part of Section 1326.

11         Again, while Attorney General Ford's recommendation alone may not be enough

12   to prove discriminatory intent, the Court considers this evidence in context. The only

13   significant alteration between the unlawful reentry provision in the Act of 1929 and Section

14   1326 was this one, recommended by Ford.[26] The 1952 Congress' silence does not evince

15   a neutral viewpoint, but worked to expand the enforceability of an admittedly racist law.

16   The Court therefore finds that this evidence contributes to its finding that Carrillo-Lopez

17   meets his burden.

18                         **iv.  Wetback Bill**

19         The Court further considers the passage of the so-called "Wetback Bill" as

20   evidence of historical background. The bill's passage is particularly probative because it

21   was "passed by the same congress during the same time frame and with the same

22   express aim as illegal reentry . . ." (ECF No. 50 at 10.) Senate Bill 1851, nicknamed the

23   "Wetback Bill," was passed March 20, 1952, just a few months before the INA. *See* United

24   Statutes at Large, 82 Cong. ch. 108, 66 Stat. 26 (March 20, 1952). The bill's stated aim

25   was to "assist in preventing aliens from entering or remaining in the United States

26   illegally." *Id.* Yet, as Carrillo-Lopez argues, the bill was reflective of Congress' racially

27

28   _____

            [26] *See* notes 9 & 10.

                                    23

1  discriminatory motivations, not only because of the nickname of the bill but also by the

2  way it sought to achieve its stated aim.

3  First, the Wetback Bill evidences discriminatory motive simply in its use of the racial

4  epithet "wetback." As Professor Gonzalez O'Brien testified: "In 1952, prior to the passage

5  of the McCarran-Walter Act, you have a Bill that is introduced and passed on March 20th

6  that is nicknamed the Wetback Bill. And this is a piece of anti-harboring legislature where,

7  throughout the debate, Mexican undocumented entrants are regularly referenced as

8  wetbacks. And Senator McFarland [of Arizona], during the debate over the Act of March

9  20th, 1952, notes that Senate Bill 1851, a Bill known as the Wetback Bill, was going to be

10 debated. Initially, this legislation was aimed strictly at Mexicans." (ECF No. 49 at 97-98.)[27]

11 Aside from the use of derogatory language, the incongruities between the stated

12 intent of the bill and the actual language of the bill demonstrate the Congress' racist

13 motives and intent. While the stated aim of the bill was to prevent "aliens from entering or

14 remaining in the United States illegally", as Carrillo-Lopez argues, it actually "illustrates

15 the intent of congress to preserve the influx of cheap and exploitable labor, while

16 simultaneously marginalizing those workers and excluding them from full participation in

17 American life." (ECF No. 50 at 10.) By failing to punish employers who hired illegal

18 immigrants and instead only punishing the laborers themselves, the "1952 and 1929

19 congresses were both balancing the hunger of the agricultural industry for exploitable

20 labor and the desire to keep America's identity white." (*Id.*)

21 The Court agrees that the "context in which [] Mexican immigration was being

22 discussed at that historical moment" is illustrative of the 1952 Congress' intent. (ECF No.

23 49 at 129-30.) Despite the lack of official debate surrounding the enactment of Section

24 1326, Professor Gonzalez O'Brien connects the Ford letter with the Wetback Bill to give

25 a more nuanced understanding of the 1952 Congress' approach:

26      what you do have is that you do have this note that's entered in the support
        for 1326 by the Department of Justice, and it's a letter from the Deputy
27      Attorney General, Peyton Ford . . .So, again, you have the use of this

28      _____
           [27]Relatedly, Professor Gonzalez O'Brien notes that this "debate around wetbacks
        is—also enters into the McCarran-Walter Act." (ECF No. 49 at 99-100.)

24

1
2
3
4
5

racialized term to describe Mexican immigrants, even though you don't have debate around Mexican immigration in the McCarran-Walter Act itself, or during debate for the McCarran-Walter Act, in part, because you have this Bill that precedes it by two months, where much of the debate is how do we limit the number of Mexican immigrants and the trafficking of undocumented Mexican immigrants into the United States? And that Bill also contained the Texas proviso, which gave workers the kind of loophole of, you know, if you're employing undocumented laborers, it doesn't constitute harboring.

6
7
8
9

(ECF No. 49 at 129-30.) Professor Gonzalez O'Brien notably concludes that "understanding the recodification under McCarran-Walter, it has to be done in the context both of what came before it, but also what was occurring at that historical moment, and at that moment in time." (*Id.*)[28]

10
11
12
13
14

This context assists the Court in its "sensitive" inquiry demanded by *Arlington Heights. See* 429 U.S. at 564. In short, both the derogatory nickname of the Wetback Bill and its criminalization of Mexican immigrant laborers while shielding employers evidences the racially discriminatory motives and intent of the same Congress who enacted Section 1326 only two months later.

15

### v. Congressional Awareness of Disparate Impact

16
17
18
19
20
21
22
23
24

Finally, the Court considers Congress' silence in light of their knowledge that Section 1326 disparately impacts Latinx people as further evidence of continued racial animus. Professor Lytle Hernández outlined the disparate impact of the criminal unlawful reentry statute over the 23 years between the law's enactment 1929 and reenactment in 1952. (ECF No. 26-1.) She specifically highlighted that "some years, Mexicans comprised 99 percent of immigration offenders" and by the 1930s "tens of thousands of Mexicans had been arrested, charged, prosecuted, and imprisoned for unlawfully entering the United States." (*Id.*)

25
26
27
28

[28]"Q: And part of the legislative background also is the Wetback Bill that occurred two months earlier. Is that fair? A: That is fair. Q: And the Wetback Bill explicitly carved out from the harboring of aliens [sic] employers? A: That is correct. Q: And that tension between employers and the utilization of south of the border migrants was the same sort of tension that we see animating that debate in 1929. Is that fair? A: That's fair." (ECF No. 49 at 184-86 (excerpts of Professor O'Brien's testimony under defense counsel's examination.)

Congress' knowledge that Section 1326 continued to disparately impact Mexican and Latinx people is evidenced by criticism from President Truman in his veto statement when he specifically critiqued the INA for expanding grounds for deportation[29] and from testimony provided by enforcers of the law—the Immigration and Naturalization Service. The Immigration and Naturalization Service testified regarding the "difficulties encountered in getting prosecutions and convictions, especially in the Mexican border area" because many violators of immigration law "are not prosecuted or, if prosecuted, get off with suspended sentences or probation." (ECF No. 45 at 2.) Congress' silence about the prior racist iterations of this bill coupled with its decision to expand the grounds for deportation and carceral punishment, despite its knowledge of the disparate impact of this provision on Mexican and Latinx people, is some evidence that racial animus was a motivating factor.

When these factors are considered together, the Court finds there is sufficient evidence to conclude that racial animus continued to be a motivating factor in the recodification of 1952. As Professor Gonzalez O'Brien testified:

> if you look at all of those things, including the racial animus that was demonstrated in the McCarran-Walter Act itself . . . then I think all of those things suggest that the decision to pass this without debate, was largely driven by the same things that drove the original codification of 1326; and that was, in part, a desire to control access to Mexican labor, and also a tendency to view Mexicans, individuals from south of the Rio Grande, and at least in the terms of the 1950s, the wetback, as a problematic population. And you don't see any significant debate over – you have a stretch between 1959 and 1952, where you have 1326 in effect, and you don't see any debate over that policy on its merits. We've been doing this for over 20 years by that point. What are the merits of 1326? . . . You don't have debate over that in 1952.

(ECF No. 49 at 129-30.)

The totality of evidence shows that the same factors motivating the passage of Section 1326 in 1929 were present in 1952. Not only did Congress fail to repudiate the racial animus clearly present in 1929, but it expanded the government's power to enforce unlawful reentry, despite President Truman's call to reimagine immigration laws. The

---

[29]See note 24.

26

1952 Congress incorporated the advice of supporters of the bill who used racial epithets in official documents, while contemporaneously passing another bill targeting "wetbacks." Although it is "not easy" to prove that racism motivated the passage of a particular statute, the Court reasons that it cannot be impossible, or *Arlington Heights* would stand for nothing.[30]

The Court therefore finds that Carrillo-Lopez has met his burden.

### b. The authority cited by the government does not preclude consideration of the Act of 1929.

Essential to the government's position is its proposition that improper motivations infecting prior versions of legislation do not carry over to reenacted versions of a law. The government argues that the Supreme Court "ha[s] viewed variants of the 'taint argument' with equal skepticism," and several circuit and district courts have found that "the ultimate focus in subsequent litigation is the intent of the reenacting legislature, not the original one." (ECF No. 29 at 24.) As explained below, the Court finds these cases do not support the government's argument that a re-enacting Congress is always shielded from the legislation's prior motivations, and instead instruct the reviewing court to consider how much the reenacting Congress actually altered the legislation.

The government relies on *Abbott v. Perez* to argue that "the presumption of legislative good faith [is] not changed by a finding of past discrimination" nor can past discrimination "condemn governmental action that is not itself unlawful." (ECF No. 51 at 3-4.) In *Abbott*, electoral redistricting plans developed in 2011 were challenged as discriminatory. Responding to that concern, Texas adopted interim plans overseen by a federal district court that were later adopted by the 2013 Legislature. *See Abbott*, 138 S. Ct. at 2315. When reviewing the 2013 plans, the district court found discriminatory intent

---

[30]*Machic-Xiap*, 2021 WL 3362738 at *1. The *Machic-Xiap* court noted it was "unaware of any federal appellate decision holding that a facially neutral act passed by Congress was motivated by racial, ethnic, or religious animus." *Id.* When faced with the record before it and lacking clear guiding or distinguishing authority from federal appellate courts, this Court cannot ignore the extensive history—both from 1929 and contemporaneously in 1952—that suggests discrimination was in part motivating Congress' enactment of Section 1326.

because the 2013 Legislature "failed to 'engage[] in a deliberative process to ensure that the 2013 plans cured any taint from the 2011 plans." *Id.* at 2318. The Supreme Court disagreed and ultimately upheld the 2013 districting plan because the "2013 Texas Legislature did not reenact the plan previously passed by its 2011 predecessor. Nor did it use criteria that arguably carried forward the effects of any discriminatory intent on the part of the 2011 Legislature." *Id.* at 2325. The Supreme Court reasoned that although a court had previously found that the 2011 Legislature "acted with discriminatory intent in framing the congressional plan, that finding was based on evidence about districts that the interim plan later changed." *Id.* Therefore "there can be no doubt about what matters: it is the intent of the 2013 Legislature." *Id.*

The facts here are distinguishable. Most importantly, here, the initial and recodified unlawful reentry statutes are nearly identical, with the exception of broader enforcement measures. In *Abbott,* the 2013 Legislature was not simply reenacting an earlier version of the districting plan, but an entirely new plan was implemented following a lower court's finding of discriminatory intent. In so doing, the new plan was explicitly created to "fix[] the problems identified," *id.* at 2329, or "cure[]" any prior discriminatory intent, *id.* at 2325. The holding in *Abbott* is based on the legislature's active response and engagement with the prior challenged statute. The Supreme Court in fact clarified:

> We do not suggest either that the intent of the 2011 Legislature is irrelevant or that the plans enacted in 2013 are unassailable because they were previously adopted on an interim basis by the Texas court. Rather, *both the intent of the 2011 Legislature and the court's adoption of the interim plans are relevant to the extent that they naturally give rise to—or tend to refute— inferences regarding the intent of the 2013 Legislature.* They must be weighed together with any other direct and circumstantial evidence of that Legislature's intent. But when all the relevant evidence in the record is taken into account, it is plainly insufficient to prove that the 2013 Legislature acted in bad faith and engaged in intentional discrimination.

*Id.* at 2327 (emphasis added). The Court found the new legislature lacked discriminatory intent precisely because of the way that it responded to the challenged provision. Moreover, the Court expressly stated that how the reenacting legislature responds to a prior discriminatory statute is probative of the reenacting legislature's intent. Unlike in

1    *Abbott*, the 1952 Congress adopted Section 1326 almost wholesale from the Act of 1929,

2    revising it only to make it more punitive.[31]

3          The government's reliance on three circuit courts of appeals decisions is similarly

4    unpersuasive. (ECF No. 51 at 4-5 (citing *Hayden v. Paterson,* 594 F.3d 150, 164-68 (2d

5    Cir. 2010); *Cotton v. Fordice,* 157 F.3d 388, 391-92 (5th Cir. 1998); *Johnson v. Governor*

6    *of State of Fla.,* 405 F.3d 1214, 1223-26 (11th Cir. 2005).) Contrary to the government's

7    argument that re-enactment of an existing law "cleanses" it from "any discriminatory

8    aspects of its history" (*id.* at 5), the Second Circuit in *Hayden* expressly warned against

9    the possibility that a legislative body "might seek to insulate from challenge a law known

10   to have been originally enacted with a discriminatory purpose by (quietly) reenacting it

11   without significant change." *Hayden*, 594 F.3d at 167 (reasoning that subsequent

12   changes to legislation tainted by racial animus should "substantively change" the prior

13   issue in a way that is "not inconsequential"). Clearly aware of this issue, the Fifth Circuit

14   in *Cotton* and the Eleventh Circuit in *Johnson* also stress that the challenged amendments

15   made substantive revisions to their racist predecessors which meaningfully impacted how

16   they would be enforced.[32] The Second Circuit reasoned that its concerns were

17   "ameliorated" because (i) there was no allegation of bad faith on the part of the re-enacting

18   legislature, (ii) there was adequate deliberation that resulted in substantive changes when

19

20   [31]The government further relies on the Supreme Court's decision in *McKlesky v.*
     *Kemp* to argue that "unless historical evidence is reasonably contemporaneous with the
21   challenged decision, it has little probative value." 481 U.S. 279, 289 n.20 (1987). There,
     the Court looked at Georgia laws in force during and just after the Civil War, finding that
22   "historical background of the decision is one evidentiary source" for proof of discrimination
     under *Arlington Heights*, but it has little probative value if it is not "reasonably
23   contemporaneous" ultimately deciding that "although the history of racial discrimination in
     this country is undeniable, we cannot accept official actions taken long ago as evidence
24   of current intent." *Id.* Here, the evidence offered and accepted by this Court regarding the
     1952 reenactment was contemporaneous in time. Thus, *McKlesky* has no bearing on the
25   Court's decision here.

26   [32]*See Cotton*, 157 F.3d at 391-92 (explaining that the amendment in question
     removed burglary, an offense commonly relied on to disenfranchise Black people, and
27   broadened the applicability of the statute to include murder and rape to better fit the state's
     race-neutral disenfranchisement purposes); *Johnson*, 405 F.3d at 1223-24 (similarly
28   reasoning that the specific amendment at issue went through multiple revisions and
     committee reviews with the purpose of removing the racial taint from a prior felon-
     disenfranchisement statute).

29

1  the statute in question was reenacted, and (iii) there was no evidence of discriminatory

2  intent of the reenacting legislature. *See Hayden*, 594 F.3d at 167.

3    Carrillo-Lopez's case is completely distinguishable. The legislatures in *Hayden*,

4  *Cotton*, and *Johnson* substantively amended the prior iterations of the laws in question in

5  an attempt to make them less racially targeted. But Section 1326 was not substantively

6  changed, or even genuinely debated. Instead, the 1952 Congress sought only to ease

7  law enforcement's burden in prosecuting those subject to Section 1326. While the

8  *Hayden*, *Cotton*, and *Johnson* legislatures were expressly revising felon-

9  disenfranchisement laws to make them more race-neutral, the 1952 Congress did not

10  depart from the original enactment of Section 1326 and instead adopted it in its entirety

11  into the INA. Moreover, that addition happened at a time that Congress did not appear to

12  be overly concerned with its animus toward Mexican and Latinx people, but instead

13  welcomed racist epithets. Carrillo-Lopez has demonstrated that the 1952 reenactment

14  not only failed to reconcile with the racial animus of the Act of 1929, but was further

15  embroiled by contemporary racial animus and discriminatory intent. The Court therefore

16  concludes that *Abbott*, *Hayden*, *Cotton*, and *Johnson* do not prohibit considering the

17  motivations of the Act of 1929 when determining whether the 1952 Congress was

18  motivated by a similar discriminatory intent.

19    **4.**  **The Court disagrees with the conclusions of other district**

20       **courts that have addressed this issue.**

21    The Court notes that Section 1326 has lately faced scrutiny in several district

22  courts. The parties have routinely supplemented their briefing in response to these

23

24

25

26

27

28

developments,[33] and the Court has worked to stay abreast of recent decisions.[34] As the Court understands the present status, no court that has addressed this issue has found that Section 1326 is unconstitutional under *Arlington Heights*. The Court will therefore explain its reasons for departing from the holdings of its sister courts.

The two cases cited by the government, *Medina-Zepeda* and *Palacios-Arias*, are distinguishable because they considered solely evidence from the 1952 reenactment. (ECF Nos. 43-1, 29-1.) Unlike in those cases, the Court here considers the surrounding legislative history and context of both the Act of 1929 and 1952 INA. The Central District of California reasoned in *Medina-Zepeda* that dicta in *Ramos v. Louisiana*, 140 S. Ct. 1390 2020), and *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246 (2020), was insufficient authority to justify relying solely on legislative history from the 1920s. (ECF No. 43-1 at 6 ("Defendant provides no authority or basis for the court to evaluate the 1952 statute solely on the basis of the legislative history relating to the Undesirable Aliens Act of 1929.").) The Court agrees with that reasoning. However, the Court here does not only consider historical background from the 1920s. *Medina-Zepeda* therefore cannot guide the Court's determination of whether Carrillo-Lopez has met his burden under *Arlington Heights*.

---

[33]The parties supplemented their briefing with the following cases: *United States v. Palacios-Arias*, Case No. 3:20-cr-62-JAG (E.D. Va. Oct. 13, 2020) (ECF No. 29-1); *United States v. Rios-Montano*, Case No. 19-cr-2123 (S.D. Cal. Dec. 8, 2020) (ECF No. 31-1); *United States v. Medina-Zepeda*, Case No. CR 20-0057 (C.D. Cal. Jan. 5, 2021) (ECF No. 43-1). The government additionally cites to *United States v. Morales-Roblero*, 2020 WL 5517594 (S.D. Cal. Sept. 14, 2020) (ECF No. 29 at 6 n.6) and *United States v. Ruiz-Rivera*, Case No. 20-mj-20306-AHG (S.D. Cal. Sept. 2, 2020) (ECF No. 29 at 22 n.13) in its opposition brief. *Palacios-Arias* and *Medina-Zepeda* address the constitutionality of Section 1326, and will be discussed below. *Rios-Montano*, *Morales-Roblero*, and *Ruiz-Rivera* address the constitutionality of Section 1325, which is also part of the INA but has a separate legislative history. Accordingly, the Court will focus on cases that challenge Section 1326 specifically.

[34]In addition to the parties' briefing, the Court notes that several courts have lately ruled on this issue. *See United States v. Machic-Xiap*, Case No. 3:19-cr-407-SI, 2021 WL 3362738 (D. Or. Aug. 3, 2021); *United States v. Wence*, Case No. 3:20-cr-0027, 2021 WL 2463567 (D.V.I. Jun. 16, 2021); *United States v. Gutierrez-Barba*, Case No. CR-19-01224-001-PHX-DJH, 2021 WL 2138801 (D. Ariz. May 25, 2021). The Court will address the arguments in *Machic-Xiap* and *Wence* below. However, the Court will not address *Gutierrez-Barba*, which applied a deferential rational-basis review instead of *Arlington Heights*, and is therefore unhelpful to the Court's analysis. *See* 2021 WL 2138801 at *5.

31

1    The Court similarly finds *Palacios-Arias* distinguishable. (ECF No. 29-1.) The

2    Eastern District of Virginia reasoned that evidence of animus from the 70th Congress

3    cannot necessarily be imputed to the 82nd Congress. Again, the Court agrees. But

4    Carrillo-Lopez has provided evidence of contemporaneous discriminatory intent

5    motivating the passage of the 1952 INA. Moreover, the Court will not ignore that Congress

6    in 1952 adopted the language of Section 1326 without substantially changing the law and

7    without debate or discussion of the invidious racism that motivated the Act of 1929, only

8    to make it more punitive.

9        Two district courts, however, have recently found that substantially similar

10   evidence to that which the Court here considers is insufficient for a defendant to meet

11   their burden. Ultimately, the Court disagrees.

12       In *United States v. Wence*, the District Court of the Virgin Islands applied *Arlington*

13   *Heights* but found the defendant had not met his burden because "Wence has failed to

14   provide any legislative history or other evidence suggestive of the motives of the 82nd

15   Congress." *See* 2021 WL 2463567, at *7. After considering the "problematic rhetoric"

16   surrounding the INA's passage, as well as the Truman veto statement and override, that

17   court concluded "Wence has not cited any part of the legislative history which discloses

18   any racial animus in the law against Latinx aliens" and "the legislative history for the 1952

19   and 1929 legislation does not reveal any discriminatory motive." *Id.* at *9. First, the Court

20   disagrees with that conclusion—as explained above, the record demonstrates

21   discriminatory motivations as to both statutes. But the Court further rejects the *Wence*

22   court's conclusion because that court appeared to blur the defendant's burden under

23   *Arlington Heights*, reasoning that alternative "valid immigration considerations," *id.*,

24   balanced out the evident "issues" with the INA, *id.* at *8. *But see Arlington Heights*, 429

25   U.S. at 265 (explaining that a challenger need not "prove that the challenged action rested

26   *solely* on a racially discriminatory purpose"). Moreover, the *Wence* court relies on

27   *Hayden*, *Cotton*, and *Johnson* to support that deliberation of other sections of the INA is

28   sufficient to cleanse the reenacted Section 1326 of its original discriminatory motivation,

1    despite the fact that Section 1326 was neither specifically debated nor substantively

2    changed. The Court is therefore unpersuaded by *Wence*.

3        In *Machic-Xiap*, the District Court for the District of Oregon considered a similar

4    challenge to Section 1326 based on similar evidence as presented here. *See Machic-*

5    *Xiap*, 2021 WL 3362738, at *12. The *Machic-Xiap* court detailed an extensive historical

6    record, and found not only that the Act of 1929 served "racist purposes," *id.* at *12, but

7    also that the defendant did provide some evidence of racial animus during the 1952

8    reenactment, *id.* at *12-14. But after concluding that the historical evidence of the Act of

9    1929 was "strong," *id.* at *12, the *Machic-Xiap* court carefully examined the remaining

10   evidence and found that despite evidence of racist motivation, each piece of evidence

11   should not be given significant or conclusive weight. *See id.* It is apparent that the *Machic-*

12   *Xiap* court conducted a thorough and sensitive inquiry, and this Court agrees that any

13   individual piece of evidence alone would likely be insufficient to demonstrate that racial

14   animus was a motivating factor. But, as stated above, the Court views the evidence—of

15   historical background, legislative history, sequence of events, and departure from normal

16   deliberative process—under the totality of the circumstances. While each piece of

17   evidence may be insufficient alone, together they show discriminatory intent on behalf of

18   the 1952 Congress specifically, and with regards to Section 1326 specifically.

19       The *Machic-Xiap* court further limited its reliance on evidence from 1929 based on

20   its application of *Abbott*. *See id.* at *14. While the Court agrees that racial animus from a

21   prior enacting legislature cannot be necessarily imputed to a reenacting legislature, the

22   Court reads *Abbott* to require that the reenacting legislature make some substantive

23   change before known racial animus is cleansed. *See Abbott*, 138 S. Ct. at 2325. Although

24   courts have an obligation to give a reenacting legislature the presumption of good faith,[35]

25   that presumption is not insurmountable. Here, the 1929 provision and Section 1326 are

26   nearly identical, the only change was not substantive, and that change was motivated by

27

28       [35] *See Machic-Xiap*, 2021 WL 3362738 at *15 (citing *Abbott* and *N.C. St. Conf. of the NAACP v. Raymond*, 981 F.3d 295, 303 (4th Cir. 2020)).

1   the Ford Letter which sought to expand the enforceability of the 1929 provision while

2   referring to Latinx people as "wetbacks." As explained above, *Abbott* does not shield the

3   reenacting legislature from scrutiny in light of such evidence. The Court therefore

4   disagrees with the conclusion of the *Machic-Xiap* court and finds that the evidence

5   Carrillo-Lopez presents is sufficient to meet his burden under *Arlington Heights*.

6         The Court is aware that proving discriminatory intent motivated the passage of a

7   specific statute is difficult—in fact, unprecedented.[36] But despite the high threshold, the

8   Court cannot deny that when considered as a whole, the evidence indicates

9   discriminatory intent on the part of the 1952 Congress.

10       **C.**    **The government has failed to show that Section 1326 would have been**

11             **enacted absent the discriminatory motivation.**

12         Having found that Carrillo-Lopez met his burden under *Arlington Heights,* the

13   burden shifts to the government to establish that "the same decision would have resulted

14   even had the impermissible purpose not been considered." 429 U.S. at 270 n. 21. The

15   government argues that it is "obvious and uncontroverted that valid, nondiscriminatory

16   objectives motivated the passage of Section 1326 in 1952 and its later amendments."

17   (ECF No. 51 at 11.) The government offers no independent evidence, but points instead

18   to Carrillo-Lopez's own expert testimony to propose three allegedly permissible

19   motivations: (1) a desire to protect American citizens from economic competition; (2) a

20   need to maintain national security; and (3) a need to maintain foreign relations with

21   international allies. (ECF No. 52 at 11.) As the Court explains below, the testimony does

22   not support a conclusion that these alternative motivations can easily be separated from

23   the demonstrated discriminatory intent.

24         The government advances two additional arguments that do not offer alternative

25   motivations for the passage of Section 1326, but which it claims are sufficient to show

26   that Section 1326 would have been enacted absent discriminatory intent. The government

27   first argues the Ninth Circuit once found Section 1326 is "a necessary piece of the

28

---

[36] *See Machic-Xiap*, 2021 WL 3362738 at *1.

1   immigration-regulation framework." (ECF No. 51 at 12 (citing *U.S. v. Hernandez-*

2   *Guerrero,* 147 F.3d 1075, 1078 (9th Cir. 1998).) Second, the government argues that

3   because Section 1326 has been passed "six times in various amended versions, all in the

4   absence of any evidence of discriminatory intent, the Court need not engage in a

5   counterfactual analysis to conclude that the law would pass absent discriminatory intent."

6   (ECF No. 51 at 13.) The Court will also address these arguments after its evaluation of

7   the proposed nondiscriminatory motivations.

8                    **1.     Alternative Nondiscriminatory Motivations**

9           The government has not met its burden under *Arlington Heights*. By failing to offer

10  any independent evidence of "obvious and uncontroverted . . . nondiscriminatory

11  objectives" motivating the passage of Section 1326, the government limits itself to relying

12  solely on the testimony of defense experts and distinguishable case law. (ECF No. 51 at

13  11.) But the expert testimony from Professors Lytle Hernández and Gonzalez O'Brien

14  does not support the government's proffered alternative reasons. Instead, that testimony

15  convincingly demonstrates that the government's proffered reasons are so intertwined

16  with racial animus such that they cannot successfully show that the "same decision would

17  have resulted even had the impermissible purpose not been considered." *See Arlington*

18  *Heights*, 429 U.S. at 270 n. 21. The Court will address each argument in turn.

19                         **a.     Economic Competition**

20          The government first argues that border enforcement was driven "by a desire to

21  protect American citizens from economic competition," citing only to Professor Lytle

22  Hernández's testimony to support this proposition. (ECF No. 51 at 11.) At the Hearing,

23  Professor Lytle Hernández agrees with the government's claim that leaders of the

24  Mexican-American middle class supported immigration enforcement because "they

25  thought that increased border enforcement would improve job security" (ECF No. 49 at

26  42-43), but she goes on to explain that this economic competition was rooted in

27  racialization and played up to "create the notion that they were in competition with each

28  other." (ECF No. 49 at 42-43). Specifically, she notes:

                                            35

> There was a notion that there was a, sort of, zero sum game of jobs, right,
> and that people of Mexican descent, largely because of segregation in the
> United States and because of that racial subrogation, gave this notion that
> Mexican-origin folks had to fight for the same jobs as to opposed to having
> all jobs open to them, and that certainly helped to create this notion that
> they were in competition with each other.

(*Id.*)

Moreover, some economic programs like the Bracero program targeted non-white populations. Professor Lytle Hernández explains that targeting is a "key indicator[] of the dynamics at play, that it's not just labor, it's a racialized labor form." (ECF No. 49 at 75-76.) Bracero workers were "an exploited labor force," subjected to racialized stereotyping and inhumane treatment. She details in her testimony that Bracero workers were routinely gassed with DDT and subjected to invasive inspections. The workers were racially stereotyped as being "fit for agricultural labor," unlike their white immigrant or domestic counterparts. (*Id.* at 77-78.) Professor Lytle Hernández's testimony concludes that any stated desire to protect American citizens from economic competition cannot reasonably be divorced from the underlying racialization of Mexican migrant laborers.

The Court agrees that even—or in this case, especially—under the auspice of economic motivation, immigration is not intrinsically separate from racial animus. Without offering any additional evidence, the government fails show that economic competition was a potential motivating factor absent the impermissible motivation: racial animus.

### b. National Security

The Court is similarly unpersuaded by the government's argument that Section 1326 was recodified due to "a need to maintain national security." (ECF No. 51 at 11.) Again, the government cites only to Professor Lytle Hernández's testimony[37] to suggest

---

[37]Professor Lytle Hernández further explains how the national security concerns of the period relevant to the INA's passage were motivated by racialized labor policies like the Bracero Program. "Q: So the start of the Bracero program happened roughly around the onset of World War II, correct? A: Yes. Post-U.S. entry into the war. Q: Right. And you wrote in Migra that this triggered increased national security and geopolitical concerns, given that the U.S. shared a 2000-mile border with Mexico, correct? A: Correct. Q: And you wrote that the U.S. State Department put pressure on the INS and Border Patrol to close the door to undocumented migrants during this time, correct? A: Correct.

1    that Section 1326 was reenacted to maintain national security interests. (*Id.*) But,

2    following the testimony cited in the government's brief, Professor Lytle-Hernández went

3    on to say:

> I mean, all of this activity is happening, you know, I would argue, uh, yes,
> within foreign relations, with an (unintelligible) of foreign relations, with an
> integrated economy, around labor concerns, concerns about what's
> emerging as the Cold War. *Racial animus is also at play.* There is no way
> in which we can understand the politics of head shaving as something that
> would have been tolerable for other than Mexican immigrants in this time
> period. And the involvement of the Mexican government does not mean that
> racial animus is not at play. Mexico has a long and deep history of race and
> subrogation, especially for indigenous folks. So, the story of race
> transcends the border.

10   (ECF No. 49 at 53 (emphasis added).) When considered in the context that the

11   government omits, Professor Lytle Hernández's testimony indicates that the desire to

12   maintain national security cannot be viewed alone because it only offers an explanation

13   in part. But her more complete answer turned on the conclusion that "racial animus is also

14   at play."[38]

15   The Court cannot consider that Professor Lytle Hernández's testimony, standing

16   alone, is sufficient to demonstrate that the need to maintain national security is an

17   "obvious and uncontroverted . . . nondiscriminatory objective motivat[ing] the passage of

18   Section 1326 in 1952" as the government argues. With no further evidence, the

19   government has again failed to meet its burden.

### c.    Foreign Relations

21   Finally, the government fails to show that "a need to maintain foreign relations with

22   international allies, including Mexico" was a motivating factor independent from the

23   demonstrated racial animus. (ECF No. 51 at 11.) Again, the government relies solely on

---

25   Q: In part, because of the national security concern presented by having a forced border
     during the world war, correct? A: In part, yeah." (ECF No. 49 at 50 (excerpts of
26   government counsel's cross-examination of Professor Lytle Hernández).)

27   [38]In response to the government's prompting to restrict her testimony to the
     questions asked, Professor Lytle Hernández responded: "Well I just want to be full in my
28   answers, so—everything is complicated so yes/no is not always the accurate answer. So
     when I think I need to give a little bit more context, I would like to be able to do that." (ECF
     No. 49 at 53-54.)

Professor Lytle Hernández's testimony. (ECF Nos. 49 at 44-47; 51 at 11-12.) But contrary to the government's conclusions, Professor Lytle Hernández testified that a nuanced understanding of foreign relations shows the dynamic in 1952 was still grounded in racial animus. While Professor Lytle Hernández acknowledges there was a concern about maintaining foreign relations with Mexico, she again goes on to say, as quoted in full above, that "racial animus is also at play" when considering the United States' foreign policy with Mexico during that period, and "the involvement of the Mexican government does not mean that rational animus is not at play." (ECF No. 49 at 53.) She further explains that during this period, Mexico "is a junior partner" in the two countries' partnership and that "they're not dictating, by any means, to the Untied States Government about how this is going to go." (*Id.* at 47.) The government's selective citation ignores repeated testimony emphasizing the connection between foreign relations and racial animus, and Professor Lytle Hernández's qualification that the United States felt free to enact legislation it felt was appropriate. It is therefore not possible for the Court to conclude based upon the record before it that the need to maintain a relationship with the government of Mexico is a factor extricable from the demonstrated discriminatory motives of the period.

Without more, the government has failed to show that valid, nondiscriminatory objectives motivated the passage of 1326 and later amendments.

## 2. Inferred Nondiscriminatory Intent

The government argues that even absent a nondiscriminatory motive, the Court can infer that the 1952 Congress had a valid, nondiscriminatory objective in passing Section 1326. (ECF No. 51 at 11-12.) The Court finds the government's proffered alternative reasoning in support of Section 1326 nonresponsive and unpersuasive. The government's only proffered evidence is the Ninth Circuit's language in *United States v. Hernandez-Guerrero,* in which the court stated it is "plain" that Section 1326 "is a necessary piece of the immigration-regulation framework." 147 F.3d 1075, 1078 (9th Cir. 1998). But the issue before the court in *Hernandez-Guerrero* was whether Congress

38

exceeded the scope of its constitutional authority when enacting Section 1326, a criminal immigration statute. *See id.* The Ninth Circuit held that because Section 1326 was a piece of immigration regulation, Congress acted within its authority to enact the statute. *See id.*

But *Hernandez-Guerrero* has no bearing on this case because the limits of Congress' immigration powers are not at issue here. The question is not whether Congress *functionally* had the authority to pass a criminal immigration statute, but whether the motivation behind Section 1326's enactment was racially discriminatory in violation of the Equal Protection Clause. That issue was not raised or discussed in *Hernandez-Guerrero* and the Court accordingly finds its application of limited use.

Ultimately, the fact that Congress has the authority to pass immigration regulations like Section 1326 does not foreclose the possibility that such legislation was passed with discriminatory intent, nor does it preclude the Court from determining whether Section 1326 is unconstitutional on other grounds. The government's own briefing concedes that courts may infer that nondiscriminatory motivation sufficient to displace discriminatory motivation only absent evidence of discriminatory intent. (ECF No. 51 at 12.) But here, Carrillo-Lopez offers substantial evidence that improper discriminatory motives were at least a factor in Section 1326's passage. Accordingly, the Court declines to infer that Section 1326's utility to the overall immigration scheme justifies an inference of nondiscriminatory motive.

### 3. Repeated Amendment

Finally, the government argues that it has met its burden under the second prong of *Arlington Heights* "given that Section 1326 has been passed six times in various amended versions, all in the absence of any evidence of discriminatory intent . . ." (ECF No. 51 at 13.) The government relies on the Eleventh Circuit's reasoning in *Johnson v. Governor of State of Florida*, in which the court held that "the state met its burden as a matter of law by substantively reenacting the law for race-neutral reasons" because repassage of an amended version of the statute "conclusively demonstrates that the [legislature] would enact the provision without an impermissible motive." 405 F.3d 1214,

39

1224 (11th Cir. 2005) (en banc). The Court finds *Johnson* is distinguishable and is unpersuaded that subsequent Congresses have cleansed § 1326 of its racial taint through amendment alone.

First, the Court does not agree that the subsequent amendments were "substantive." In addressing whether an 1868 felon disenfranchisement provision was alleviated of its racial taint by a subsequent 1968 reenactment, the *Johnson* court considered that the reenactment "narrowed the class of persons" to whom the disenfranchisement provision would be applicable. *See id.* Moreover, the Eleventh Circuit noted that the Florida legislature engaged in an extensive deliberative process in which many alternatives were considered to revise the 1868 law in conformance with modern goals. *See id.* at 1221-22.

But Section 1326's reenactment and subsequent amendments never substantively altered the original provision, making this case distinguishable from *Johnson*. Since 1952, Section 1326 has been amended five times—in 1988, 1990, 1994, and twice in 1996.[39] These amendments did not change the operation of Section 1326, but instead served to increase financial and carceral penalties. The 1988 amendments added increased imprisonment time for those with prior felony convictions.[40] The 1990 amendment removed the $1,000 cap on financial penalties.[41] The 1994 amendments increased the penalties for persons convicted of felonies from five years to 10, and for those convicted of aggravated felonies from 15 years to 20, while also drawing in additional penalties for persons with certain misdemeanor convictions.[42] And the 1996 amendments to §

---

[39] *See* note 11.

[40] *See* Pub. L. 100-690, title VII § 7345(a), 102 Stat. 4471 (Nov. 18, 1988) (codified at 8 U.S.C. § 1326(b) (1988)).

[41] *See* Pub. L. 101-649, title V § 543(b)(3), 104 Stat. 5059 (Nov. 29, 1990).

[42] *See* Pub. L. 103-322, title XIII § 130001(b), 108 Stat. 2023 (Sept. 13, 1994) (codified at 8 U.S.C. § 1326 (1994)).

1326(b)[43] again only added a penalty for those convicted of reentry while on parole, probation, or supervised release.[44] These amendments do not reflect any change of Congressional intent, policy, or reasoning, but merely work to increase Section 1326's deterrent value.

Second, there has been no attempt at any point to grapple with the racist history of Section 1326 or remove its influence on the legislation. The Supreme Court has noted in concurrences on two recent occasions that a legislature's failure to confront a provision's racist past may keep it "'[t]ethered' to its original 'bias.'" *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2274 (2020) (Alito, J., concurring); *see also Ramos v. Louisiana*, 140 S. Ct. 1390, 1410 (2020) (Sotomayor, J., concurring) ("Where a law otherwise is untethered to racial bias—and perhaps also where a legislature actually confronts a law's tawdry past in reenacting it—the new law may well be free of discriminatory taint. That cannot be said of the laws at issue here.").[45] This reasoning is

---

[43]Carrillo-Lopez was charged only with violating §§ 1326(a) and (b), while the AEDPA amendments added §§ 1326(c) and (d), which deal with collateral habeas corpus relief. *See* Pub. L. 104-132, title IV §§ 401(c), 438(b), 441(a), 110 Stat. 1267-68, 1276, 1279 (Apr. 24, 1996) (codified at 8 U.S.C. § 1326 (2000)).Those provisions, too, function to add a 10 year sentence to a conviction.

[44]*See* Pub. L. 104-208, div. C title III §§ 305(b), 308(d)(4)(J), 308(e)(1)(K), 308(e)(14)(A), 324(a), 324(b); 110 Stat. 3009-606, 3009-618 to 3009-620, 3009-629 (Sept. 30, 1996).

[45]Other district courts in this circuit have rejected applying *Ramos* and *Espinoza* to similar challenges, but those cases are distinguishable. The clearest distinguishable reason is that other courts reject the relevancy of the 1929 legislative history absent something contemporaneous with the 1952 reenactment. *See United States v. Lazcano-Neria*, Case No. 3:20-mj-04538-AHG, 2020 WL 6363685, at *8 (S.D. Cal. Oct. 29, 2020) (rejecting the argument that § 1325 of the INA must reckon with the racist legislative history that happened "decades before" because the defendant did not supply an analysis of "relevant legislative history"); *see also United States v. Rios-Montano*, Case No. 19-CR-2123-GPC, 2020 WL 7226441, at *3 (S.D. Cal. Dec. 8, 2020) (same); *United State v. Lucas-Hernandez*, Case No. 19MJ24522-LL, 2020 WL 6161150, at *3 (S.D. Cal. Oct. 21, 2020) (same); *United States v. Ruiz-Rivera*, Case No. 3:20-mj-20306-AHG2020 WL 5230519, at *3 (S.D. Cal. Sept. 2, 2020) (same).

In *United States v. Gutierrez-Barba*, the district court declined to apply *Ramos* and *Espinoza* because it found the statute had been cleansed by a later amendment. *See* Case No. CR-19-01224-001-PHX-DJH, 2021 WL 2138801, at *3-4 (D. Ariz. May 25, 2021). But that court addressed only the discriminatory intent of the Act of 1929 and did not consider evidence that the 1952 reenactment was also motivated by

41

1  not binding precedent, nor does the fact that a prior iteration of a statute was tainted by

2  racial animus necessarily mean that every subsequent reenactment will be. *See, e.g.*,

3  *Abbott*, 138 S. Ct. at 2325 (confirming that, while past discrimination does not "flip[] the

4  evidentiary burden on its head," the historical background of legislative enactment is

5  "relevant to the question of intent"). But this reasoning is instructive and, here, persuasive.

6      Carrillo-Lopez has established, and the government concedes, that the Act of 1929

7  was motivated by racial animus. The government does not assert the 1952 Congress

8  addressed that history when it reenacted Section 1326. Moreover, the government fails

9  to demonstrate how any subsequent amending Congress addressed either the racism

10  that initially motivated the Act of 1929 or the discriminatory intent that was

11  contemporaneous with the 1952 reenactment. The record before the Court reflects that

12  at no point has Congress confronted the racist, nativist roots of Section 1326. Instead,

13  the amendments to Section 1326 over the past ninety years have not changed its function

14  but have simply made the provision more punitive and broadened its reach. Accordingly,

15  the Court cannot find that subsequent amendments somehow cleansed the statute of its

16  history while retaining the language and functional operation of the original statute.

17      In conclusion, the government has failed to establish that a nondiscriminatory

18  motivation existed in 1952 for reenacting Section 1326 that exists independently from the

19  discriminatory motivations, in either 1929 or 1952. Moreover, the government's alternative

20  arguments—that a nondiscriminatory motive was "plain" or that subsequent amendments

21  somehow imply the racial taint was cleansed—are not supported by caselaw nor borne

22  out by the evidentiary record. In sum, on the record before the Court, the Court can only

23  conclude that the government has not met its burden. Because Section 1326 violates the

24  ─────────────

25  contemporaneous discriminatory intent. Moreover, the Court disagrees with that court's
   conclusion that Section 1326 was ultimately cleansed of any racial animus by a 1965

26  amendment elsewhere in the INA which purported to prohibit discrimination on the basis
   of race, sex, nationality, place of birth, or place of residence. *See id.* at *4 (referencing

27  Pub. L. No. 89-236, 66 Stat. 175, 911 (Oct. 3, 1965)). That amendment was added to 8
   U.S.C. § 1152, a subsection that prohibited discrimination between members of "any

28  single foreign state." The Court will not extend this provision, which does not even address
   discrimination between immigrants from different countries, to a criminal statute with
   demonstrated racist origins in a separate section of the subchapter.

1  Equal Protection Clause of the Fifth Amendment, the Court will grant Carrillo-Lopez's

2  Motion.

**III.  CONCLUSION**

4  The Court notes that the parties made several arguments and cited to several

5  cases not discussed above. The Court has reviewed these arguments and cases and

6  determines that they do not warrant discussion as they do not affect the outcome of the

7  motions before the Court.

8  It is therefore ordered that Carrillo-Lopez's motion to dismiss (ECF No. 26) is

9  granted.

10  It is further ordered that Carrillo-Lopez's indictment (ECF No. 1) is dismissed.

11  The Clerk of Court is directed to enter judgment accordingly and close the case.

12  DATED THIS 18th Day of August 2021.

MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE