TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
ELIA HERRERA (Cal. Bar No. 293278)
SURIA M. BAHADUE (Cal. Bar No. pending)
Assistant United States Attorneys
General Crimes Section
        1200 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone: (213) 894-2024/5487
        Facsimile: (213) 894-0141
        Email:     elia.herrera@usdoj.gov
                   suria.bahadue@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 20-00321-JAK |
|---|---|
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT UNDER THE EQUAL PROTECTION CLAUSE |
| v. | |
| PEDRO ALONZO LOPEZ CHACON, aka "Pedro Lopez," "Grumpy," "Pedro Alonzo Lopez-Chacon," and "Pedro Lopez Chacon, | |
| Defendant. | |

        Plaintiff United States of America, by and through its counsel
of record, the United States Attorney for the Central District of
California and Assistant United States Attorneys Elia Herrera and
Suria M. Bahadue, hereby files its Opposition to Defendant's Motion
to Dismiss the Indictment Under the Equal Protection Clause.  (Dkt.
99.)

//

//

1   This opposition is based upon the attached memorandum of points

2   and authorities, the files and records in this case, and such further

3   evidence and argument as the Court may permit.

4   Dated: November 24, 2021        Respectfully submitted,

5                                   TRACY L. WILKISON
                                    United States Attorney
6
                                    SCOTT M. GARRINGER
7                                   Assistant United States Attorney
                                    Chief, Criminal Division
8

9            /s/ *Elia Herrera*
                                    ELIA HERRERA
10                                  SURIA M. BAHADUE
                                    Assistant United States Attorneys
11
                                    Attorneys for Plaintiff
12                                  UNITED STATES OF AMERICA

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

DESCRIPTION                                                          PAGE(S)

TABLE OF CONTENTS.................................................i

TABLE OF AUTHORITIES.............................................ii

MEMORANDUM OF POINTS AND AUTHORITIES..............................1

I.    INTRODUCTION................................................1

II.   BACKGROUND.................................................2

      A.   Defendant's Crimes....................................2

      B.   History of Criminal Immigration Laws..................3

III. ARGUMENT....................................................5

      A.   Section 1326 Is Subject to Rational-Basis Review......6

      B.   Section 1326 Satisfies Rational-Basis Review.........11

      C.   Even if Arlington Heights Applies, Defendant Has
           Failed to Show that § 1326 Was Enacted with
           Discriminatory Intent................................12

           1.   Most of Defendant's Cited Legislative History
                Concerns a Different Statute Passed by a
                Different Congress..............................13

           2.   The INA Was Not Enacted with Discriminatory
                Intent.........................................17

           3.   Any Disparate Impact Is Explained by Geography......19

           4.   Subsequent Developments Have Removed Any "Taint"....20

      D.   Carrillo-Lopez Is Not Persuasive and Is Contrary to
           the Decisions of Every Other Court To Address This
           Claim................................................22

IV.   CONCLUSION.................................................24

**TABLE OF AUTHORITIES**

DESCRIPTION                                                          PAGE(S)

Federal Cases

Abbott v. Perez,
    138 S. Ct. 2305 (2018).....................................passim

Ablang v. Reno,
    52 F.3d 801 (9th Cir. 1995)....................................7

Aleman v. Glickman,
    217 F.3d 1191 (9th Cir. 2000)..............................11, 12

Bryan v. United States,
    524 U.S. 184 (1998)...........................................19

Cath. Soc. Servs. v. Reno, 134 F.3d 921 (9th Cir. 1998).............7

City of Mobile v. Bolden,
    446 U.S. 55 (1980) (plurality opinion)........................14

Cotton v. Fordice,
    157 F.3d 388 (5th Cir. 1998)..............................15, 16

E. Bay Sanctuary Covenant v. Trump,
    932 F.3d 742 (9th Cir. 2018)..................................18

Espinoza v. Montana Department of Revenue,
    140 S. Ct. 2246 (2020)........................................17

Fiallo v. Bell,
    430 U.S. 787 (1977)....................................7, 8, 11

Hayden v. Paterson,
    594 F.3d 150 (2d Cir. 2010)...............................15, 16

Heller v. Doe,
    509 U.S. 312 (1993).......................................11, 12

Hernandez-Mancilla v. Holder, 633 F.3d 1182 (9th Cir. 2011)........8

Hunter v. Underwood,
    471 U.S. 222 (1985).......................................16, 17

Johnson v. Governor,
    405 F.3d 1214 (11th Cir. 2005) (en banc).................15, 16

Kleindienst v. Mandel,
    408 U.S. 753 (1972)...........................................7

Ledezma-Cosino v. Sessions, 857 F.3d 1042 (9th Cir. 2017) (en banc).8

Menotti v. City of Seattle, 409 F.3d 1113 (9th Cir. 2005)..........6

ii

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                PAGE(S)

Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.,
    463 U.S. 29 (1983)...................................................10

N.C. State Conf. of the NAACP v. Raymond,
    981 F.3d 295 (4th Cir. 2020)........................................15

Palmer v. Thompson,
    403 U.S. 217 (1971)..................................................7

Ramos v. Louisiana,
    140 S. Ct. 1390 (2020)..............................................17

Ramos v. Wolf,
    975 F.3d 872 (9th Cir. 2020).....................................10, 11

United States v. Turner,
    104 F.3d 1180 (9th Cir. 1997).......................................20

Trump v. Hawaii,
    138 S. Ct. 2392 (2018).........................................7, 8, 12

Turner Broad. Sys. v. FCC,
    512 U.S. 622 (1994)..................................................7

United States v. Arenas-Ortiz, 339 F.3d 1066 (9th Cir. 2003).......19

United States v. Armstrong, 517 U.S. 456 (1996)....................19

United States v. Ayala-Bello, 995 F.3d 710 (9th Cir. 2021)......1, 20

United States v. Barron-Rivera, 922 F.2d 549 (9th Cir. 1991)........3

United States v. Carrillo-Lopez,
    --- F. Supp. 3d ----,
    2021 WL 3667330 (D. Nev. Aug. 18, 2021)........................22, 23

United States v. Cupa-Guillen, 34 F.3d 860 (9th Cir. 1994).....11, 12

United States v. Dumas,
    64 F.3d 1427 (9th Cir. 1995)....................................15, 20

United States v. Gutierrez-Barba,
    No. CR 19-01224-DJH,
    2021 WL 2138801 (D. Ariz. May 25, 2021)..............21, 22, 23

United States v. Hernandez-Guerrero,
    147 F.3d 1075 (9th Cir. 1998)..............................passim

United States v. Lazcano-Neria,
    No. MJ 20-4538-AHG,
    2020 WL 6363685 (S.D. Cal. Oct. 29, 2020)....................23

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                PAGE(S)

United States v. Lopez-Flores, 63 F.3d 1468 (9th Cir. 1995)... 1, 8, 9

United States v. Lucas-Hernandez,
        No. MJ 19-24522-LL,
        2020 WL 6161150 (S.D. Cal. Oct. 21, 2020)..................... 23

United States v. Machic-Xiap, --- F. Supp. ----,
        2021 WL 3362738 (D. Or. Aug. 3, 2021)........................ 23

United States v. Medina Zepeda,
        No. CR 20-00057-FMO, (C.D. Cal. Jan. 5, 2021).... 14, 17, 23, 24

United States v. Novondo-Ceballos,
        No. CR 21-383-RB,
        2021 WL 3570229 (D.N.M. Aug. 12, 2021)....................... 22

United States v. O'Brien,
        391 U.S. 367 (1968)........................................ 6, 7

United States v. Palacios-Arias,
        No. CR 20-00062 (E.D. Va. Oct. 13, 2020)..................... 23

United States v. Price,
        361 U.S. 304 (1960).......................................... 14

United States v. Rios-Montano,
        No. CR 19-2123-GPC,
        2020 WL 7226441 (S.D. Cal. Dec. 8, 2020).................. 21, 23

United States v. Ruiz-Chairez,
        493 F.3d 1089 (9th Cir. 2007)........................... 9, 10, 12

United States v. Wence,
        No. CR 20-0027,
        2021 WL 2463567 (D.V.I. June 16, 2021)....................... 23

United States v. X-Citement Video, Inc.,
        513 U.S. 64 (1994)........................................... 14

Village of Arlington Heights v. Metropolitan Housing Devel. Corp.,
        429 U.S. 252 (1977)..................................... 6, 12, 13

Waterkeeper All., Inc. v. U.S. EPA,
        399 F.3d 486 (2d Cir. 2005).................................. 14

State Cases

18 U.S.C. § 1203................................................... 8

8 U.S.C. § 1325............................................... 9, 23

iv

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                      PAGE(S)

8 U.S.C. § 1326...............................................passim

Statutes/Acts

136 Cong. Rec. 36,844 (1990)...................................... 22

Act of Mar. 4, 1929,
     Pub. L. No. 70-1018, 45 Stat. 1551........................... 4

Anti-Drug Abuse Act of 1988,
     Pub. L. No. 100-690, 102 Stat. 4181.......................... 5

Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No.
     104-132, 110 Stat. 1214...................................... 5

Consolidated Appropriations Act of 1997,
     Pub. L. No. 104-208, 110 Stat. 3009.......................... 5

H.R. Rep. No. 82-1365 (1952)...................................... 18

Immigration Act of 1917,
     Pub. L. No. 64-301 39 Stat. 874, 889......................... 4

Immigration Act of 1990,
     Pub. L. No. 101-649 104 Stat. 4978........................... 5

Immigration and Nationality Act of 1965,
     Pub. L. No. 89-236, 79 Stat. 911............................ 21

Immigration and Nationality Act, Pub. L. No. 82-414, 66 Stat. 163
     (1952)....................................................... 4

S. Rep. No. 70-1456 (1929)........................................ 4

U.S.S.G. § 2L1.2.................................................. 9

Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No.
     103-322, Stat. 1796.......................................... 5

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.   INTRODUCTION

3        Defendant Pedro Lopez Chacon ("defendant") has been charged with

4    being an illegal alien found in the United States, in violation of

5    8 U.S.C. §§ 1326(a), (b)(1), (b)(2).  In his Motion to Dismiss

6    ("Motion") (Dkt. 99), defendant claims that 8 U.S.C. § 1326 -- a

7    statute enacted by Congress in 1952 and applied in countless cases

8    since -- violates the Constitution's Equal Protection Clause.  This

9    Court should deny the Motion for two reasons:

10       First, § 1326 satisfies rational-basis review.  Congress has

11   "sweeping" and "plenary" control over immigration policy.  See United

12   States v. Hernandez-Guerrero, 147 F.3d 1075, 1076 (9th Cir. 1998).

13   Given this broad authority, challenges to criminal immigration laws

14   are, at most, subject to rational-basis review.  See, e.g., United

15   States v. Ayala-Bello, 995 F.3d 710, 714-15 (9th Cir. 2021); United

16   States v. Lopez-Flores, 63 F.3d 1468, 1473-75 (9th Cir. 1995).  And

17   as the Ninth Circuit has recognized, § 1326 plainly satisfies this

18   low bar because it is "a necessary piece of the immigration-

19   regulation framework."  Hernandez-Guerrero, 147 F.3d at 1078.

20       Second, there is no evidence of discriminatory intent.  Even if

21   the Arlington Heights standard applies, statements that members of a

22   prior Congress made in support of a different statute provide no

23   insight on why § 1326 was enacted decades later.  The Supreme Court

24   has rejected defendant's theory that prior discriminatory intent can

25   forever "taint" a law.  See Abbott v. Perez, 138 S. Ct. 2305, 2324-25

26   (2018).  What matters is that the legislative history of § 1326

27   contains no evidence of racial animus.

28

## II.   BACKGROUND

### A.   Defendant's Crimes

Defendant is a citizen and national of El Salvador.  (Mot. at 1.)  In May 2009, he was indicted for engaging in a RICO conspiracy in furtherance of the MS-13 street gang, in violation of 18 U.S.C. § 1962(d), from 1995 through 2009.  (RICO Case,[1] Dkt. 1427 (May 13, 2009).)  After defendant's conviction, an aggravated felony under 8 U.S.C. § 1101(a)(43)(J), he was deported to El Salvador in May 2015. (Dkt. 110, Ex. A.)

Approximately a year later, in June 2016, defendant tried to illegally reenter the United States using false entry documents. Specifically, he arrived at the San Ysidro, California, Port of Entry; presented a California Birth Certificate and driver's license bearing someone else's name; and falsely claimed to be an American citizen.  (("1326 Case")[2] Dkt. 1 at 2 (June 13, 2016).)  For that conduct, defendant was charged with attempted entry after deportation, in violation of 8 U.S.C. § 1326.  (Id. at 1.)  He pled guilty and was sentenced to eight months' imprisonment.  (1326 Case, Dkts. 14 (July 21, 2016), 28 (Nov. 7, 2016).)  Defendant was removed in August 2017.  (Dkt. 110, Ex. D.)

Seven months later, in February 2018, defendant tried to illegally reenter the United States, again.  He was caught at the border, charged with misdemeanor illegal entry, sentenced to time served, and deported in October 2018.  (Dkt. 110, Ex. F.)

---

[1] "RICO Case" refers to the docket in defendant's RICO conspiracy prosecution, United States v. Alfaro, et al., Case No. 09-CR-00466-DSF (C.D. Cal.).

[2] "1326 Case" refers to the docket in defendant's illegal-reentry prosecution, United States v. Lopez-Chacon, Case No. 16-CR-01564-BTM (S.D. Cal.).

2

At some point after his October 2018 deportation, defendant tried, and succeeded, to reenter the United States for the fourth time.  In June 2020, a law enforcement officer, working on a gang enforcement patrol in an area known for gang activity, saw defendant's car engaged in suspicious activity and executed a traffic stop and cited him for tinted windows.  (See Dkt. 1 ¶ 4(a).)  A Homeland Securities Investigations ("HSI") Task Force Officer learned of this encounter, conducted a records check and discovered that defendant had applied for a California driver's license, which was issued by the DMV in January 2020.  (Id. ¶ 5.)

Thereafter, in July 2021, defendant was indicted for being an illegal alien found in the United States following deportation, in violation of 8 U.S.C §§ 1326(a), (b)(1), (b)(2).  (See Dkts. 1, 15.) Now, on the eve of trial for that crime, defendant challenges § 1326 as unconstitutional under the Equal Protection Clause.

**B.   History of Criminal Immigration Laws**

The Ninth Circuit has explained that "8 U.S.C. § 1326 is designed to effectively enforce the immigration laws." United States v. Barron-Rivera, 922 F.2d 549, 555 (9th Cir. 1991).  "By threatening with criminal prosecution any alien found in the United States who has previously been 'excluded, deported, or removed,' Congress sought in § 1326 to give teeth to civil immigration statutes and to ensure compliance with civil deportation orders." Hernandez-Guerrero, 147 F.3d at 1078.  This "immigration-regulation purpose" is clear from a review of the statute's background.  See id.

In the Immigration Act of 1917, Congress passed legislation requiring deportation of aliens who entered the United States "at any time or place other than as designated by immigration officials,

3

. . . or who enter[ed] without inspection."  Pub. L. No. 64-301, § 19, 39 Stat. 874, 889.  However, there was no penalty, other than repeated deportation, for reentering after deportation.  To enhance the deterrent value of the deportation laws, the 70th Congress made reentry after deportation a felony offense punishable by up to two years' imprisonment.  See Act of Mar. 4, 1929, Pub. L. No. 70-1018, 45 Stat. 1551.  The Senate Report from the Committee on Immigration explained that "there is no provision of law under which a penalty, other than repeated deportation, can be imposed on aliens who have been expelled from the United States and who reenter the country unlawfully.  It frequently happens that aliens of the criminal and other classes who are deported under the general immigration law reenter the country unlawfully."  S. Rep. No. 70-1456, at 1 (1929).  Indeed, "in some instances such aliens have been deported four or five times, only to return as soon as possible to the United States in an unlawful manner."  Id.  Thus, Congress determined that a statute prohibiting illegal reentry "would be of material aid in enforcing our immigration laws."  Id.

Over twenty years later, in 1952, the 82nd Congress passed the Immigration and Nationality Act ("INA"), a comprehensive act designed to "revise the laws relating to immigration, naturalization, and nationality" in the United States.  See Pub. L. No. 82-414, 66 Stat. 163 (1952).  In this comprehensive legislation, Congress created a new offense prohibiting the reentry of a deported alien: 8 U.S.C. § 1326.  Id. § 276, 66 Stat. at 229.

Over the years, Congress has updated § 1326 multiple times.  In the Anti-Drug Abuse Act of 1988, for example, the 100th Congress added subsection (b), creating enhanced penalties for aliens with

prior felony convictions.  <u>See</u> Pub. L. No. 100-690, § 7345, 102 Stat.
4181, 4471.  Congress also adopted additional modifications in the
Immigration Act of 1990, Pub. L. No. 101-649, § 543, 104 Stat. 4978,
5059 (increasing the fine provision); the Violent Crime Control and
Law Enforcement Act of 1994, Pub. L. No. 103-322, § 130001, 108 Stat.
1796, 2023 (increasing penalties); the Antiterrorism and Effective
Death Penalty Act of 1996, Pub. L. No. 104-132, § 441, 110 Stat.
1214, 1279 (adding subsection (d)); and the Omnibus Consolidated
Appropriations Act of 1997, Pub. L. No. 104-208, § 308, 110 Stat.
3009, 3009-618 (replacing several references to "deported" and
"excluded" with updated terms).

Until August 2021, no court had ever suggested that <u>any</u> version
of this nearly 70-year-old statute violated the Equal Protection
Clause.  To the contrary, the Ninth Circuit recognizes that "§ 1326
is a necessary piece of the immigration-regulation framework,"
<u>Hernandez-Guerrero</u>, 147 F.3d at 1078, and numerous district courts,
as defendant concedes, have rejected the very motion defendant now
brings, <u>see infra</u> Section III.D; <u>see also</u> Mot. at 2.

## III. ARGUMENT

This Court should deny defendant's Motion.  The Ninth Circuit
has repeatedly held that criminal immigration laws are subject to
rational-basis review.  Section 1326 satisfies this standard because
it is a necessary piece of the immigration-regulation framework.  And
even if the <u>Arlington Heights</u> standard applies, defendant has not met
his burden of demonstrating that § 1326 was enacted with
discriminatory intent.  Indeed, he has not even shown that it has a
discriminatory effect.  Accordingly, this Court should join the many
other district courts, including courts in this district, that have

5

1    rejected defendant's argument.

2        **A.    Section 1326 Is Subject to Rational-Basis Review**

3        Defendant's Motion is predicated on the premise that an equal

4    protection challenge to § 1326 should be evaluated under the multi-

5    factor test set forth in <u>Village of Arlington Heights v. Metropolitan</u>

6    <u>Hous. Dev. Corp.</u>, 429 U.S. 252 (1977). (<u>See</u> Mot. at 2-4.)  In

7    <u>Arlington Heights</u> -- a civil case unrelated to immigration -- a real

8    estate developer challenged a zoning board's refusal to grant a

9    rezoning request that would have accommodated low-income housing.

10   <u>Id.</u> at 254.

11       Defendant has failed to identify any circuit-level cases where

12   the <u>Arlington Heights</u> test was used to review a law passed by

13   Congress.  And with good reason.  The Supreme Court has long held

14   that it "will not strike down an otherwise constitutional statute on

15   the basis of an alleged illicit legislative motive."  <u>United States</u>

16   <u>v. O'Brien</u>, 391 U.S. 367, 383 (1968); <u>see also Menotti v. City of</u>

17   <u>Seattle</u>, 409 F.3d 1113, 1130 n.29 (9th Cir. 2005) ("The Supreme Court

18   has held unequivocally that it 'will not strike down an otherwise

19   constitutional statute on the basis of an alleged illicit legislative

20   motive.'" (quoting <u>O'Brien</u>, 391 U.S. at 383)).  The Supreme Court has

21   also warned against trying to determine the "motive" of a law based

22   on the scattered legislative speeches of a few members of Congress.

23   "What motivates one legislator to make a speech about a statute is

24   not necessarily what motivates scores of others to enact it, and the

25   stakes are sufficiently high for us to eschew guesswork."  <u>O'Brien</u>,

26   391 U.S. at 384.  Therefore, courts should not void a law "which

27   Congress had the undoubted power to enact and which could be

28   reenacted in its exact form if the same or another legislator made a

                                    6

1  'wiser' speech about it." Id.; see Turner Broad. Sys. v. FCC, 512

2  U.S. 622, 652 (1994); Palmer v. Thompson, 403 U.S. 217, 224 (1971)

3  ("[N]o case in this Court has held that a legislative act may violate

4  equal protection solely because of the motivations of the men who

5  voted for it.").

6      Yet that is precisely what defendant asks this Court to do.  His

7  request is particularly inappropriate because "in cases of this

8  sort" -- that is, involving immigration policy -- "it is not the

9  judicial role . . . to probe and test the justifications for the

10 legislative decision." Fiallo v. Bell, 430 U.S. 787, 799 (1977).

11 Indeed, for more than a century, "it has been universally

12 acknowledged that Congress possesses authority over immigration

13 policy as an incident of sovereignty." Hernandez-Guerrero, 147 F.3d

14 at 1076 (cleaned up).  The Supreme Court has called Congress's

15 inherent immigration power "plenary"; the Ninth Circuit has deemed it

16 "sweeping." Id. (quoting Kleindienst v. Mandel, 408 U.S. 753, 765

17 (1972); and Cath. Soc. Servs. v. Reno, 134 F.3d 921, 927 (9th Cir.

18 1998)).  "Whatever the label, all agree that 'over no conceivable

19 subject is the legislative power of Congress more complete than it is

20 over' the admission of aliens." Id. (quoting Fiallo, 430 U.S. at

21 792).  Given Congress's expansive authority, there is a "limited

22 scope of judicial inquiry into immigration legislation." Fiallo, 430

23 U.S. at 792; see also Trump v. Hawaii, 138 S. Ct. 2392, 2419 (2018)

24 ("deferential standard of review" applies in immigration cases).  In

25 this context, courts may review only whether such laws are "facially

26 legitimate and bona fide." Mandel, 408 U.S. at 769.

27      This deferential standard is "equivalent to the rational basis

28 test." Ablang v. Reno, 52 F.3d 801, 804 (9th Cir. 1995).  And the

Supreme Court has squarely held that it applies to equal protection challenges.  In Fiallo, the Court reviewed an equal protection challenge to a law that gave immigration preferences to mothers, but not fathers, of illegitimate children.  430 U.S. at 788-90.  Despite the nature of the claim, the Supreme Court found "no reason to review the broad congressional policy choice at issue . . . under a more exacting standard."  Id. at 795.  The Court also emphasized that it was "not the judicial role in [immigration cases] to probe and test the justifications for the legislative decision."  Id. at 799; see also Hawaii, 138 S. Ct. at 2419 (same).  Consistent with Fiallo, the Ninth Circuit has routinely applied rational-basis review to equal protection claims raised in the immigration context.  See, e.g., Hernandez-Mancilla v. Holder, 633 F.3d 1182, 1185 (9th Cir. 2011) ("We review equal protection challenges to federal immigration laws under the rational basis standard[.]"); Ledezma-Cosino v. Sessions, 857 F.3d 1042, 1049 (9th Cir. 2017) (en banc) (same); see also id. at 1050 (Kozinski, J., concurring) (arguing that "the government's burden is even lighter than rational basis: We approve immigration laws that are facially legitimate without probing or testing possible justifications").

Moreover, the Ninth Circuit has repeatedly held that challenges to criminal immigration statutes such as § 1326, which apply to immigrants generally without regard to country of origin, are subject to rational-basis review.  In Lopez-Flores, for example, the court addressed an equal protection challenge to 18 U.S.C. § 1203, which "classifies offenders on the basis of the offender's and the victim's nationality."  63 F.3d at 1471.  The defendants argued that § 1203 violates the Equal Protection Clause because "it arbitrarily

1   classifies offenders and victims on the basis of alienage." Id. at
2   1472. But consistent with Supreme Court precedent, the Ninth Circuit
3   rejected this claim because "[f]ederal legislation that classifies on
4   the basis of alienage [is] subject to the lowest level of judicial
5   review." Id. at 1475.

6   In United States v. Ruiz-Chairez, 493 F.3d 1089 (9th Cir. 2007),
7   the Ninth Circuit considered a similar equal protection challenge to
8   U.S.S.G. § 2L1.2 -- the sentencing guideline that "effectuates the
9   illegal reentry statute" and determines the offense level for § 1326
10  convictions. Id. at 1091. Again, the court applied rational-basis
11  review. Id. And "[b]ecause the illegal reentry statute is a proper
12  exercise of Congress's immigration power, and because § 2L1.2
13  properly implements this congressional directive," the Court
14  concluded that "§ 2L1.2 serves a legitimate government interest and
15  has a rational basis." Id. at 1091 (citations omitted).

16  Indeed, the Ninth Circuit recently applied these same principles
17  to 8 U.S.C. § 1325, which punishes the related crime of illegal
18  entry. In Ayala-Bello, the defendants were charged with "first-time
19  illegal entry," which is a petty offense, but were still prosecuted
20  on the normal criminal docket, not the CVB process. 995 F.3d at 713-
21  14. Defendants argued that prosecuting illegal entry (but not other
22  petty offenses) on the normal criminal docket violated their right to
23  equal protection. Id. The court, however, squarely rejected their
24  claim that "heightened scrutiny" applied because the policy
25  discriminates against noncitizens. Id. at 714-15. Rather, the Ninth
26  Circuit would review "the government's policy, at most, under the
27  rational basis test" because "[f]ederal classifications based on
28  alienage receive rational basis review." Id. at 715. And the policy

satisfied this standard because "the federal government has a
legitimate interest in controlling our borders."  Id.

The reasoning of the foregoing cases fully applies here.
Moreover, the case that defendant cites for the proposition that
§ 1326 should be evaluated under the Arlington Heights standard (Mot.
at 3) -- Ramos v. Wolf, 975 F.3d 872 (9th Cir. 2020)-- does not
support his position.  It does not even intimate that the Ninth
Circuit intended to undermine its consistent case law establishing
that the INA itself is proper exercise of Congress's immigration
power and its provisions are subject to rational-basis review.  And
at issue in Ramos was agency action, which is generally not accorded
the same deference as statutes enacted by Congress.  See Motor
Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins., 463 U.S.
29, 43 n.9 (1983) ("We do not view as equivalent the presumption of
constitutionality afforded legislation drafted by Congress and the
presumption of regularity afforded an agency in fulfilling its
statutory mandate.").  This case is thus readily distinguishable.

Ramos involved an equal protection challenge to the DHS's
recission of Temporary Protected Status ("TPS") designation for
certain countries.  975 F.3d at 883.[3]  Notably, the agency's
recission of TPS was not facially neutral -- it was directed at
specific countries.  Id. at 880-83.  The Ninth Circuit again applied
the Arlington Heights standard because it was reviewing the actions
of "an agency in its administration of a humanitarian relief program
established by Congress for foreign nationals who have lawfully

---

[3] TPS protects noncitizens who are lawfully present in the
United States and cannot safely return to their home country.  Id. at
879.

10

1    resided in the United States for some time." Id. at 896.

2         Here, defendant is not challenging an agency's administration of

3    a program established by Congress; he is challenging the statute

4    itself.  Nor is he challenging government action with respect to

5    immigrants here lawfully, as in Ramos.  Rather, he is challenging a

6    statute specifically directed at individuals who have already been

7    removed once and who have flouted U.S. law by returning illegally --

8    people with no authorization to be in the United States and whose

9    actions threaten the security of the border.  As the Ninth Circuit

10   has recognized, illegal reentry is a crime precisely because "there

11   is a strong societal interest in controlling immigration and in

12   effectively policing our borders." United States v. Cupa-Guillen, 34

13   F.3d 860, 863 (9th Cir. 1994).  This strong interest distinguishes

14   the present case from Ramos and calls for a more deferential standard

15   of review.

16        Ultimately, the Supreme Court has squarely held that equal

17   protection challenges to congressional immigration laws are subject

18   to rational-basis review.  See Fiallo, 430 U.S. at 795.  Whatever

19   exception was created by Ramos, it does not apply to § 1326.  Rather,

20   this Court should follow the controlling precedent of Ayala-Bello,

21   Lopez-Flores, and Ruiz-Chairez.

22        **B.   Section 1326 Satisfies Rational-Basis Review**

23        The rational-basis test is an "exceedingly low level of judicial

24   scrutiny." Aleman v. Glickman, 217 F.3d 1191, 1201 (9th Cir. 2000).

25   The test is met where "there is a rational relationship between the

26   disparity of treatment and some legitimate governmental purpose."

27   Heller v. Doe, 509 U.S. 312, 320 (1993).  "[T]he government 'has no

28   obligation to produce evidence to sustain the rationality of a

11

statutory classification'; '[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.'" Glickman, 217 F.3d at 1201 (quoting Heller, 509 U.S. at 320). Therefore, "it should come as no surprise that the Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny." Hawaii, 138 S. Ct. at 2420.

Section 1326 clears this low bar. The government has a legitimate interest in "controlling immigration and in effectively policing our borders." Cupa-Guillen, 34 F.3d at 863. And there is a clear nexus between that interest and § 1326. "[I]t is plain that § 1326 is a necessary piece of the immigration-regulation framework; without the threat of criminal prosecution that it provides, Congress's immigration-regulation authority would be fatally undermined -- all bark and no bite." Hernandez-Guerrero, 147 F.3d at 1078; see also Ruiz-Chairez, 493 F.3d at 1091-92 (concluding that "the 16 level enhancement for illegal reentrants who have committed drug related and violent crimes has a rational basis"). Accordingly, 8 U.S.C. § 1326 has a rational basis.

### C. Even if Arlington Heights Applies, Defendant Has Failed to Show that § 1326 Was Enacted with Discriminatory Intent

In Arlington Heights, the Supreme Court reviewed an equal protection challenge to a zoning board's refusal to grant a rezoning request that would have accommodated low-income housing. 429 U.S. at 254. The Court explained that the plaintiffs had the "burden of proving that discriminatory purpose was a motivating factor in the [the board's] decision." Id. at 270. In analyzing that issue, the Court considered both "circumstantial and direct evidence of intent," including the "impact of the official action" on protected classes,

1  the "historical background of the decision," the "specific sequence

2  of events leading up to the challenged decision," and the

3  "legislative or administrative history."  Id. at 266-68.  Even if

4  § 1326 is subjected to that analysis (it should not be), defendant

5  has not established that it was enacted with discriminatory intent.

6         1.   Most of Defendant's Cited Legislative History Concerns
                a Different Statute Passed by a Different Congress

7

8         The majority of defendant's Motion is devoted to arguing that

9  the legislative history of the illegal reentry statute passed in 1929

10 (the "1929 Act") establishes that § 1326 was motivated by racial

11 animus.  (Mot. at 4-6.)  The government does not dispute that several

12 Congressmen made discriminatory, racist, and offensive comments in

13 support of that legislation.  Nor does the government dispute that

14 eugenics and other pseudo-scientific theories that may have held some

15 sway in the 1920s have no place in a modern, civilized society.  But

16 the evidence of discriminatory intent referenced by defendant relates

17 to a different law passed by a different Congress at a different

18 time.  Therefore, it is not relevant to whether 8 U.S.C. § 1326 was

19 motivated by racial animus.

20       In rejecting identical claims, courts in this district have

21 found there is "no authority or basis for the court to evaluate the

22 1952 statute solely on the basis of the legislative history relating

23 to the Undesirable Aliens Act of 1929."  United States v. Medina

24 Zepeda, No. CR 20-00057-FMO, Dkt. 33 at 5 (C.D. Cal. Jan. 5, 2021);

25 see also, e.g., United States v. Calderilla-Linares, No. CR 21-307-

26 DSF, Dkt. 34 at 2 (C.D. Cal. Sept. 27, 2021) (rejecting challenge to

27 8 U.S.C. § 1326); United States v. Calderon Nonbera, No. CR 19-725-

28 ODW, Dkt. 82 at 4 (C.D. Cal. Oct. 12, 2021) (same); United States v.

1   Candelaria, No. CR 20-117-RGK, Dkt. 40 at 3 (C.D. Cal. Oct. 4, 2021)

2   (same).  On the contrary, the Supreme Court has rejected similar

3   reasoning, and found that the views of one Congress are not "of great

4   weight" in determining the meaning of a law passed by a different

5   Congress.  United States v. X-Citement Video, Inc., 513 U.S. 64, 77

6   n.6 (1994).  And the views of just a few members of a different

7   Congress "are of even less weight."  Id.  Thus, the type of

8   legislative history relied upon by defendant -- expressing the views

9   of a few members of a different Congress about a law they did not

10  pass -- "form[s] a hazardous basis for inferring" congressional

11  intent.  United States v. Price, 361 U.S. 304, 313 (1960); see also

12  Waterkeeper All., Inc. v. U.S. EPA, 399 F.3d 486, 508 (2d Cir. 2005)

13  ("Prior legislative history is a hazardous basis for inferring the

14  intent of a subsequent Congress . . . .").

15       Based on these commonsense principles, the Supreme Court has

16  held that "past discrimination cannot, in the manner of original sin,

17  condemn governmental action that is not itself unlawful."  Abbott,

18  138 S. Ct. at 2324 (cleaned up) (quoting City of Mobile v. Bolden,

19  446 U.S. 55, 74 (1980) (plurality opinion)).  Nor is legislative

20  intent an artifact that carries over from one law to the next.  See

21  City of Mobile, 446 U.S. at 74 (explaining that "[m]ore distant

22  instances of official discrimination in other cases are of limited

23  help in resolving" whether discriminatory intent has been proved in a

24  given case).  Rather, each legislature is entitled to a

25  presumption of good faith, and this presumption is "not changed by a

26  finding of past discrimination."  Abbott, 138 S. Ct. at 2324.

27       The Supreme Court's decision in Abbott is particularly

28  instructive on this point.  In Abbott, the plaintiffs raised an equal

14

1  protection challenge to a redistricting plan enacted by the 2013

2  Texas Legislature.  138 S. Ct. at 2318.  However, the focus of their

3  claim was the actions of a different legislature; specifically, the

4  plaintiffs argued that the 2011 Legislature had harbored a

5  discriminatory intent in passing an earlier plan and this

6  "discriminatory taint" had carried over to the 2013 Legislature.  Id.

7  The Supreme Court flatly rejected this theory.  Id. at 2324-26.  As

8  the Court explained, "there can be no doubt about what matters: It is

9  the intent of the 2013 Legislature."  Id. at 2325.

10      Similarly, in United States v. Dumas, the Ninth Circuit rejected

11  attempts to ascribe the racism underlying one Congress's decision to

12  criminalize cocaine in 1914 to a different Congress's decision to

13  distinguish between crack and cocaine decades later.  64 F.3d 1427,

14  1430 (9th Cir. 1995).  In that case, "Dumas point[ed] to the racism

15  which permeated the legislative debates leading to enactment of the

16  Harrison Act of 1914, the first federal law to criminalize cocaine"

17  as support for his equal protection claim.  Id.  But the Ninth

18  Circuit correctly concluded that this evidence was irrelevant because

19  "changes which occurred in American society between 1914 and 1986

20  . . . make it anomalous to ascribe to the 1986 Congress the racism of

21  the Congress of 1914."  Id. (cleaned up).

22      Other Circuits have also concluded that a finding of

23  discriminatory intent in a prior legislature does not taint a law

24  passed by a later one.  See, e.g., N.C. State Conf. of the NAACP v.

25  Raymond, 981 F.3d 295, 303-05 (4th Cir. 2020); Hayden v. Paterson,

26  594 F.3d 150, 166-67 (2d Cir. 2010); Johnson v. Governor, 405 F.3d

27  1214, 1223-24 (11th Cir. 2005) (en banc); Cotton v. Fordice, 157 F.3d

28  388, 391-92 & n.7 (5th Cir. 1998).  Those courts have rejected

15

defendant's argument that prior intent "remains legally operative" unless and until some affirmative contrary showing is made. Johnson, 405 F.3d at 1223; see Hayden, 594 F.3d at 166-67. Instead, challengers must show that the "current version" of the law was "adopted out of a desire to discriminate." Cotton, 157 F.3d at 392.

Defendant makes a passing reference to Hunter v. Underwood, 471 U.S. 222 (1985), but that authority does not conflict with this long line of precedent. (Mot. at 4, 8.) Rather, in Hunter, the Supreme Court addressed an equal protection challenge to an article of the Alabama Constitution adopted in 1901 that disenfranchised anyone convicted of certain crimes. 471 U.S. at 226-27. The state did not dispute that this article was adopted for discriminatory reasons, but argued that it was still constitutional because "[s]ome of the more blatantly discriminatory" parts of the article had been struck down "in the succeeding 80 years." Id. at 228-33. The Supreme Court rejected this argument because the enactment of the remaining provisions was still "motivated by a desire to discriminate against blacks on account of race and the section continues to this day to have that effect." Id. at 233.

This reasoning does not apply here because the 1929 Act is no longer in force. In Hunter, the Supreme Court was reviewing provisions of the original 1901 article that had never been recodified or repealed -- and which were indisputably motivated by discriminatory intent. 471 U.S. at 233. By contrast, here, defendant asks this Court to review a different law than the one he challenges, passed by an entirely different Congress. Indeed, as highlighted in Abbott, 138 S. Ct. at 2325, Hunter specifically declined to address the question of whether the article would have

1    been valid if "enacted today," 471 U.S. at 233.   Thus, <u>Hunter</u> is

2    inapplicable.

3        Defendant's reliance on <u>Ramos v. Louisiana</u>, 140 S. Ct. 1390

4    (2020) is similarly misplaced.  (Mot. at 1.)   <u>Ramos</u> does not support

5    the broad claim that prior discrimination can forever taint a later

6    law passed by a different legislature.   In <u>Ramos</u>, the Supreme Court

7    held that the Sixth Amendment "requires a unanimous verdict to

8    convict a defendant of a serious offense."   140 S. Ct. at 1394.   That

9    result flowed from a historical and textual analysis of the Sixth

10   Amendment.   <u>See id.</u> at 1399-1402.   The Court also highlighted that

11   nonunanimous juries were adopted for "racially discriminatory

12   reasons."   <u>Id.</u> at 1401 (emphasis omitted).   The majority, however,

13   explicitly noted that this historical background was not the basis of

14   its decision; rather, it agreed that "the dissent is right about one

15   thing -- a jurisdiction adopting a nonunanimous jury rule even for

16   benign reasons would still violate the Sixth Amendment."   <u>Id.</u> at 1401

17   n.44.   But it reached that conclusion independent of the historical

18   racism associated with nonunanimous jury laws.   <u>Id.</u> at 1401 n.44.

19       The Supreme Court employed the same analysis in <u>Espinoza v.</u>

20   <u>Montana Dep't of Revenue</u>, 140 S. Ct. 2246 (2020).   In that case, the

21   Court considered whether application of a "no-aid" provision to bar

22   religious schools from participating in a state scholarship program

23   violated the First Amendment.   140 S. Ct. at 2254.   But, again, the

24   Court reached that conclusion independent of arguments of

25   discriminatory intent in other no-aid provisions.   <u>Id.</u> at 2259.

26           2.   <u>The INA Was Not Enacted with Discriminatory Intent</u>

27       The question before this Court is whether 8 U.S.C. § 1326 --

28   first passed in 1952 as part of the INA and reenacted several times

since then -- was enacted with discriminatory intent.  The history of this statute plainly demonstrates that it was not.

As a threshold matter, defendant is wrong that § 1326 was a "mere reenactment" of the 1929 Act.  (Mot. at 7-8.)  Section 1326 was enacted as part of the INA in 1952.  Congress's purpose in passing the INA was "to enact a comprehensive, revised immigration, naturalization, and nationality code."  H.R. Rep. No. 82-1365, at 5 (1952).  It "replaced" the "disparate statutory scheme" that previously regulated immigration law and remains the "governing statutory framework" in this field.  E. Bay Sanctuary Covenant v. Trump, 932 F.3d 742, 756 (9th Cir. 2018).  The INA thus represented a major sea change in immigration law, not some mere reenactment of a law from decades earlier.  And beyond this broader context, the INA made at least one major change to § 1326.  The new version of illegal reentry included the "found-in" provision, which expanded its scope to noncitizens found in the country's interior.

Moreover, nothing in the legislative history of § 1326 or the INA that demonstrates that the statute was motivated by discriminatory intent.  By 1952, all the proponents of the 1929 Act mentioned in defendant's Motion were either dead or out of Congress.  Significantly, defendant points to no similar statements in the legislative history of § 1326.

Similarly unpersuasive is defendant's argument that § 1326 was motivated by racial animus because the same Congress also passed a different law that some Senators referred to as the "Wetback Bill." (Mot. at 7-8.)  There is no doubt that the term "wetback" is an offensive and unacceptable racial epithet.  But the use of this slur in the legislative history of a different bill (by just a handful of

1   Congressmen) sheds no light on the purpose motivating § 1326.

2       Finally, defendant refers to President Truman's statement in

3   support of his veto of the INA, which Congress overrode.  (Mot. at 7-

4   8.)  Yet, President Truman made no references to § 1326 in this

5   statement.  And in any event, "the fears and doubts of the opposition

6   are no authoritative guide to the construction of legislation."

7   Bryan v. United States, 524 U.S. 184, 196 (1998) (cleaned up).

8           3.   Any Disparate Impact Is Explained by Geography

9       Apart from legislative history, defendant also argues that

10  § 1326 was enacted with discriminatory intent because it has a

11  disparate impact on Latino defendants.  (Mot. at 6.)  According to

12  defendant, "over 97% of persons apprehended at the border in 2000

13  were of Mexican descent."  (Id.)  But even if true, any disparate

14  impact is explained by geography, not race.  As the Ninth Circuit

15  noted in responding to a similar claim of selective prosecution,

16  "common sense suggests that it would be substantially more difficult

17  for an alien removed to China to return to the United States than for

18  an alien removed to Mexico to do so."  United States v. Arenas-Ortiz,

19  339 F.3d 1066, 1070 (9th Cir. 2003); see also United States v.

20  Armstrong, 517 U.S. 456, 465 (1996) ("The requirements for a

21  selective-prosecution claim draw on ordinary equal protection

22  standards." (cleaned up)).  Therefore, it is hardly surprising that

23  so many people prosecuted for illegal reentry are Latino.

24      Moreover, the Supreme Court has confronted -- and rejected -- an

25  argument virtually identical to defendant's.  See Dep't of Homeland

26  Sec. v. Regents of the Univ. of Cal., 140 S. Ct. at 1915.  When

27  Regents reached the Supreme Court, the plaintiffs argued that the

28  recission of DACA was motivated by racial animus because, among other

1   reasons, most DACA recipients are Latino.  Id.  The Court, however,

2   rejected that claim "because Latinos make up a large share of the

3   unauthorized alien population, [so] one would expect them to make up

4   an outsized share of recipients of any cross-cutting immigration

5   relief program."  Id.  Indeed, "[w]ere this fact sufficient to state

6   a claim, virtually any generally applicable immigration policy could

7   be challenged on equal protection grounds."  Id. at 1916.

8        Regardless, disparate impact alone is insufficient to establish

9   discriminatory intent.  In Dumas, for example, the defendant offered

10  "statistics showing that Blacks comprise only 12% of the nation's

11  total population, but are involved in 92% of all federal crack

12  prosecutions."  64 F.3d at 1429.  But absent evidence of

13  discriminatory intent, the Ninth Circuit concluded that this evidence

14  alone was "insufficient to support a finding of invidious racial

15  discrimination in a facially neutral law."  Id.; see also United

16  States v. Turner, 104 F.3d 1180, 1184-85 (9th Cir. 1997) (denying

17  selective prosecution claim on same grounds); Ayala-Bello, 995 F.3d

18  at 714 (illegal reentry laws necessarily have a disparate impact on

19  aliens, but "disparate impact does not prove disparate treatment").

20  The same is true here.

21            4.   Subsequent Developments Have Removed Any "Taint"

22       In the end, defendant has failed to offer any persuasive

23  evidence that § 1326 was enacted with discriminatory intent.  Rather,

24  he relies upon statements that were made by proponents of different

25  bills, members of different Congresses, and people outside of

26  Congress.  Even if these statement had some limited relevance, this

27  type of indirect and unconvincing evidence is not enough to satisfy

28  defendant's heavy burden.  See Abbott, 138 S. Ct. at 2327-30

1   (concluding that similar evidence was "plainly insufficient").

2       Furthermore, defendant ignores that § 1326 and the INA have not

3   remained static since 1952.  Section 1326 has been modified and

4   reenacted multiple times, including in 1988, 1990, 1994, and 1996

5   (twice).  So, too, has the INA.  Even if defendant's flawed legal

6   theory is correct -- it is not -- two significant developments have

7   cleansed § 1326 of any discriminatory "taint."

8       First, Congress amended the INA in 1965 to add a new provision

9   stating: "[n]o person shall receive any preference or priority or be

10  discriminated against in the issuance of an immigrant visa because of

11  the person's race, sex, nationality, place of birth, or place of

12  residence[.]"  Immigration and Nationality Act of 1965, Pub. L. No.

13  89-236, § 2, 79 Stat. 911, 911-12.  This amendment also abolished

14  national-origin quotas and replaced them with a new admission system.

15  Id. § 1, 79 Stat. at 911.  "Essentially, the people themselves

16  adopted amendments to the INA aimed at prohibiting invidious

17  discrimination to remove the 'bad taint' of its prior iterations."

18  United States v. Gutierrez-Barba, No. CR 19-01224-DJH, 2021 WL

19  2138801, at *4 (D. Ariz. May 25, 2021) (rejecting same claim).

20      Second, Congress amended § 1326 as part of the Immigration Act

21  of 1990.  "While not specifically referencing the 1929 law or

22  condemning white supremacy or eugenics, the legislative history for

23  the 1990 legislation reveals a 180-degree turn away from the racist

24  tropes that accompanied the enactment of the 1929 immigration law."

25  United States v. Rios-Montano, No. CR 19-2123-GPC, 2020 WL 7226441,

26  at *5 (S.D. Cal. Dec. 8, 2020).  Rather, this legislation reaffirmed

27  the non-discriminatory reasons for passing § 1326.  As one

28  Congressman summarized:

> [The Act would] not disturb the basic reasons for which we
> have always, and will always, exclude aliens: For cases
> where aliens have criminal records, when they are public
> health risks, when they violate drug laws, when they are
> likely to become economic burdens on the country, <u>or when
> they have previously violated U.S. Immigration laws</u>.  This
> is a comprehensive reform of exclusions laws which is a
> rational accommodation of the concerns of everyone -- from
> those of the administration to those of civil libertarians.

<u>Id.</u> at *6 (emphasis added) (quoting 136 Cong. Rec. 36,844 (1990)).

Notably, the 1990 legislation was supported by politicians and interest groups from across the ideological spectrum, including Nancy Pelosi, Edward Roybal, the Mexican American Legal Defense and Education Fund ("MALDEF"), and the American Civil Liberties Union. <u>Id.</u> at *5-6; <u>see also Abbott</u>, 138 S. Ct. at 2328 (explaining that MALDEF's support was "evidence that the Legislature's objective was reasonable").  Ultimately, "[t]he thorough deliberative process Congress undertook in 1990, combined with the lack of legislative history addressing Section 1325 [or Section 1326], underscores the absence of proof of the 101st Congress's discriminatory intent." <u>Rios-Montano</u>, 2020 WL 7226441, at *6.

### D.  <u>Carrillo-Lopez</u> **Is Not Persuasive and Is Contrary to the Decisions of Every Other Court To Address This Claim**

This Court should not reach a different conclusion based on the recent decision in <u>United States v. Carrillo-Lopez</u>, --- F. Supp. 3d -‑--, 2021 WL 3667330 (D. Nev. Aug. 18, 2021).  This decision remains a true outlier: every other judge to confront defendant's claim has determined that § 1326 is constitutional.  <u>See, e.g.</u>, <u>Calderilla-Linares</u>, No. CR 21-307-DSF, Dkt. 34 at 2; <u>United States v. Novondo-Ceballos</u>, No. CR 21-383-RB, 2021 WL 3570229, at *6 (D.N.M. Aug. 12, 2021); <u>United States v. Machic-Xiap</u>, No. 3:19-cr-407-SI, 2021 WL

3362738 (D. Or. Aug. 3, 2021); <u>United States v. Wence</u>, No. CR 20-
0027, 2021 WL 2463567, at *10 (D.V.I. June 16, 2021); <u>United States
v. Gutierrez-Barba</u>, No. CR 19-01224-DJH, 2021 WL 2138801, at *5 (D.
Ariz. May 25, 2021); <u>United States v. Palacios-Arias</u>, No. CR 20-
00062, Dkt. 37 at 3-8 (E.D. Va. Oct. 13, 2020); <u>see also United
States v. Rios-Montano</u>, No. CR 19-2123-GPC, 2020 WL 7226441, at *8
(S.D. Cal. Dec. 8, 2020) (rejecting identical challenge to 8 U.S.C.
§ 1325); <u>United States v. Lazcano-Neria</u>, No. MJ 20-4538-AHG, 2020 WL
6363685, at *6-9 (S.D. Cal. Oct. 29, 2020) (same); <u>United States v.
Lucas-Hernandez</u>, No. MJ 19-24522-LL, 2020 WL 6161150, at *1-4 (S.D.
Cal. Oct. 21, 2020) (same); <u>Medina Zepeda</u>, No. CR 20-00057-FMO, Dkt.
33, at *1 (discussed above); <u>Calderon Nonbera</u>, No. CR 19-725-ODW,
Dkt. 82at 4 (rejecting challenge to 8 U.S.C. § 1326); <u>United States
v. Suquilanda</u>, No. CR 21-263-VM, 2021 WL 4895956, at *5 (S.D.N.Y.
Oct. 20, 2021); <u>United States v. Samuels-Baldayaquez</u>, No. CR 20-83,
2021 WL 5166488, at *3 (N.D. Ohio Nov. 5, 2021); <u>Candelaria</u>, No. CR
20-117-RGK, Dkt. 40 at *3.

Moreover, the reasoning of <u>Carrillo-Lopez</u> is simply not
persuasive.  At bottom, the <u>Carrillo-Lopez</u> court concluded that the
"racial taint" of the 1929 Act has carried over to § 1326 and --
despite five reenactments by multiple Congresses -- it has somehow
yet to be "cleansed."  2021 WL 3667330, at *23-25.  Like defendant,
that court insists that Congress must "grapple with the racist
history of Section 1326 or remove its influence on the legislation"
if it ever wishes to criminalize illegal reentry.  <u>Id.</u> at *24.

As explained above, these contentions are inconsistent with
Supreme Court precedent.  Again, "past discrimination cannot, in the
manner of original sin, condemn governmental action that is not

itself unlawful." <u>Abbott</u>, 138 S. Ct. at 2324 (cleaned up).  And § 1326 should not be judged based on "legislative history from laws enacted decades earlier." <u>Medina Zepeda</u>, No. CR 20-00057-FMO, Dkt. 33 at 5.  When § 1326's own history is assessed, the statute passes constitutional muster -- whatever the standard.

**IV.  CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court deny defendant's Motion.