UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

| Case No. | LA CR 20-00321-JAK-1 | Date | December 27, 2021 |
|---|---|---|---|

| Present: The Honorable | John A. Kronstadt, United States District Judge |
|---|---|
| Interpreter | N/A |

| T. Jackson | Not Reported | Not Present: David R. Friedman |
|---|---|---|
| *Deputy Clerk* | *Court Reporter/Recorder* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| Pedro Alonzo Lopez Chacon | No | | X | Richard M. Callahan, Jr. | No | | |

Proceedings: **(IN CHAMBERS) ORDER RE DEFENDANT'S MOTION TO DISMISS THE INDICTMENT UNDER THE EQUAL PROTECTION CLAUSE (DKT. 99)**

I. **Introduction**

On July 28, 2020, Pedro Alonzo Lopez Chacon ("Lopez Chacon" or "Defendant") was charged in a single-count indictment for violation of 8 U.S.C. §§ 1326(a), (b)(1), (b)(2). Dkt. 15. On November 18, 2021, Defendant filed a Motion to Dismiss the Indictment Under the Equal Protection Clause (the "Motion" (Dkt. 99)). On November 24, 2021, the Government filed an opposition to the Motion (the "Opposition" (Dkt. 122)).

A hearing on the Motion was held on December 2, 2021, with the matter to be discussed further at the Final Pretrial Conference. On December 9, 2021, the Final Pretrial Conference was held and the Motion was taken under submission. For the reasons stated in this Order, the Motion is **DENIED**.[1]

II. **Analysis**

In support of the Motion, Defendant argues that 8 U.S.C. § 1326 violates the Equal Protection Clause of the Fifth Amendment because it was enacted "with a discriminatory purpose, which disparately impacts a disfavored group." Motion at 6. The Government argues that the statute satisfies rational basis review and, alternatively, that "the legislative history of § 1326 contains no evidence of racial animus." Opposition, at 8.

    A.    Standard of Review

When assessed under the Equal Protection Clause of the Fifth Amendment, a facially neutral statute

---

[1] The same facial challenge to § 1326 was also presented in another case before this Court, *United States v. Fredy Stanley Cruz Ramos*, CR 19-189-JAK, Dkt. 75. Because the motion to dismiss in *Ramos* and the present Motion are substantively the same, a parallel order is entered in *Ramos* adopting the analysis presented in this Order.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

may be found to result in the denial of equal protection if it is enacted with a discriminatory purpose and "bears more heavily on one race than another." *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)).[2] *Arlington Heights* held that "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Id.* at 265. Although analyzing whether the impact of an official action "bears more heavily on one race than another . . . may provide an important starting point," *id.* at 266 (citation and internal quotation marks omitted), a law "will not be held unconstitutional solely because it results in a racially disproportionate impact." *Id.* at 264-65.

Equal protection challenges to "federal immigration laws," however, are generally reviewed under the rational basis standard. *Hernandez-Mancilla v. Holder*, 633 F.3d 1182, 1185 (9th Cir. 2011); *cf. United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1076 (9th Cir. 1998). The authority of Congress over immigration has been described as "plenary" and "sweeping." *Hernandez-Guerrero*, 147 F.3d at 1076 (citations omitted). Under a rational basis review, an immigration "statute is presumed constitutional, and the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it." *Hernandez-Mancilla*, 633 F.3d at 1185 (citation and internal quotation marks omitted).

   B.  Application

The parties dispute whether the *Arlington Heights* standard applies to Defendant's challenge to § 1326. The Government contends that the statute should be reviewed only under the rational basis standard.

    1.  Rational Basis Standard

Under the rational basis standard, Defendant's challenge fails. Section 1326 applies to an individual who was previously subject to "an order of exclusion, deportation, or removal" and "thereafter enters, attempts to enter, or is at any time found in, the United States," with certain limited exceptions. The Ninth Circuit has held that "[t]he text of § 1326 plainly reveals its immigration-regulation purpose." *Hernandez-Guerrero*, 147 F.3d at 1078 (concluding that Congress had the constitutional authority to enact § 1326). Defendant has not negated "every conceivable basis" that might support the statute. *See Hernandez-Mancilla*, 633 F.3d at 1185 (citation omitted). The importance of regulating immigration as well as issues as to public safety, are among those bases that have not been challenged. Therefore, the Motion is denied if this standard applies.

    2.  The *Arlington Heights* Standard

Defendant argues that the *Arlington Heights* standard applies. *See, e.g., Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 518-20 (9th Cir. 2018), *rev'd in part, vacated in part sub nom. Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020); *Ramos v. Wolf*, 975 F.3d 872, 896-99 (9th Cir. 2020). Because it is determined that Defendant's challenge also fails under the *Arlington Heights* standard, the following analysis assumes, without deciding, that the *Arlington Heights* standard applies.

---

[2] The "approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment." *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975) (collecting cases).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

      a.      Discriminatory Intent

          (1)     Legal Standards

Under *Arlington Heights*, the moving party bears the initial burden of demonstrating disparate impact and "proof that a discriminatory purpose has been a motivating factor in the decision." 429 U.S. at 265-66. "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266. A court should consider the "historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes," the "specific sequence of events leading up to the challenged decision," "[d]epartures from the normal procedural sequence," and the "legislative or administrative history." *Id.* at 267-68. Evidence as to other actions may also be considered. *Id.* at 268 (explaining that the list of potentially relevant evidence is not exhaustive).

If the moving party provides "[p]roof that the [official action] was motivated in part by a racially discriminatory purpose," the burden shifts to the non-moving party to "establish[] that the same decision would have resulted even had the impermissible purpose not been considered." *Id.* at 270 n.21. The moving party need not show "that racial discrimination was 'the dominant or primary' purpose." *Ramos*, 975 F.3d at 896 (quoting *Arlington Heights*, 429 U.S. at 265) (internal quotation marks omitted). Rather, "[w]hen there is . . . proof that a discriminatory purpose has been a motivating factor in the decision, . . . judicial deference is no longer justified." *Arlington Heights*, 429 U.S. at 265-66.

          (2)     Application

Defendant argues that racial prejudice was a motivating factor in the decisions by Congress to enact the initial illegal reentry statute in 1929, and its amendment through § 1326 in 1952. Defendant has failed to meet his initial burden under *Arlington Heights*. *See id.* at 266-68; *United States v. Machic-Xiap*, ___ F. Supp. 3d. ___, 2021 WL 3362738, at *11-14 (D. Or. 2021) (concluding that the defendant failed to prove "that racial animus was a motivating factor in the enactment of § 1326").

             (a)     The Proffered Evidence

Two district courts within the Ninth Circuit have held evidentiary hearings addressing this issue. *See Machic-Xiap*, 2021 WL 3362738, at *3 n.4; *United States v. Carrillo-Lopez*, ___ F. Supp. 3d ___, 2021 WL 3667330, at *1 (D. Nev. 2021). Defendant submitted a copy of the decision in *Carrillo-Lopez* as an exhibit attached to the Motion and stated that "the extensive record presented to the district court [in *Carrillo-Lopez*] on this issue, as well as the court's analysis and conclusions are incorporated by reference." Motion, at 5 n.1. The Government's Opposition did not challenge the factual bases for Defendant's arguments or the consideration of the proffered evidence that was incorporated by them.

The transcripts of the evidentiary hearings in *Machic-Xiap* and *Carrillo-Lopez* have been provided to this Court in another case, *United States v. Fredy Stanley Cruz Ramos*, CR 19-189-JAK, Dkt. 81 (Exhibits T & U). The Court takes judicial notice of these transcripts. *See* Fed. R. Evid. 201 (allowing for judicial notice of facts "not subject to reasonable dispute because [they] . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *Harris v. Cnty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) ("We may take judicial notice of undisputed matters of public record, . . . including documents on file in federal or state courts." (citation omitted)); *Selane Prods., Inc. v. Cont'l Cas. Co.*, ___ F. Supp. 3d ___, 2020 WL 7253378, at *3 (C.D. Cal. 2020) ("Under Federal Rule of Evidence 201, a court may take judicial notice of court filings and other matters of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

public record."). The transcripts have been reviewed as if the same testimony were proffered in this case.

(b)     Application of the *Arlington Heights* Factors

There is significant and substantial evidence that the legislative history of the predecessor to § 1326, which was adopted under a different code section in 1929,[3] reflects racial animus. *Machic-Xiap*, 2021 WL 3362738, at *11-12. In *Carrillo-Lopez*, Professor Kelly Lytle Hernández testified about evidence relating to the passage of that predecessor statute, the "Undesirable Aliens Act of 1929" (the "1929 Act"), which was "the very first time that Congress criminalized unauthorized entry and re-entry, post-deportation, into the United States." *Ramos*, Dkt. 81-1 at 22. *Carrillo-Lopez* describes the evidence of racial animus underlying the 1929 Act, including the contemporaneous "Juan Crow regime," which was deemed a "racialized subjugation system in place that mirror[ed] what was happening in the American South." 2021 WL 3667330, at *7-9.[4]

Professor Lytle Hernández also testified that the passage of the 1929 Act came at the end of the so-called "Tribal Twenties," where "Arianism" and eugenics were popular topics of discourse in the United States. *Ramos*, Dkt. 81-1 at 28. Some members of Congress made remarks that reflected racism while debating the 1929 Act, including one "who argued that Mexicans were 'poisoning the American citizen' because they were of a 'very undesirable' class." *Carrillo-Lopez*, 2021 WL 3667330, at *8. The court further noted that the "racial vitriol expressed during the debates was directed almost exclusively at Mexicans—even though Canadians were also entering the United States in record numbers." *Id.* *Carrillo-Lopez* concluded that the evidence "clearly indicates" that the 1929 Act was motivated in part by racial animus. *Id.* at *9; *see also Machic-Xiap*, 2021 WL 3362738, at *12 (explaining that "the original statute criminalizing illegal reentry was a compromise between two groups animated by racial animus"). Indeed, in *Carrillo-Lopez*, "[t]he government ultimately conceded that discriminatory intent motivated the passage of the Act of 1929." 2021 WL 3667330, at *7.

*Machic-Xiap* also discussed the economic and social circumstances that led to the marginalization of Mexicans in the United States at this time, concluding that it "facilitate[d] the economic exploitation of that group." 2021 WL 3362738, at *12. The court found that in the mid-1920s, "although 'all kinds of people' were eligible for deportation, [the newly formed] Border Patrol was mostly deporting 'one population,' immigrants from south of the border." *Id.* at *6. The court determined that two political groups, both "animated by racial animus," compromised to create the illegal reentry statute. *Id.* at *12. Farmers retained a cheap labor force "and gained 'the threat of imprisonment in . . . negotiations' with undocumented laborers." *Id.* at *6. "Congressmen who feared that persons from Latin America imperiled the nation's blood purity, meanwhile, gained a legal way to separate them from [the] rest of the population." *Id.* The court also stated that the 1929 Act "solidified perceptions of persons from Latin America as a separate, unwelcomed race." *Id.* at *7. For these reasons, the court concluded that, "the 1929 Act served two racist purposes." *Id.* at *12.

---

[3] Section 1326 was enacted 23 years later as part of the Immigration and Nationality Act of 1952 ("INA"). *Machic-Xiap*, 2021 WL 3362738, at *1.

[4] Professor Lytle Hernández also provided a declaration in *Ramos* that re-stated much of her testimony in *Carrillo-Lopez*. *Ramos*, Dkt. 75-1 at 2. In the declaration, Professor Lytle Hernández described the "highly racialized practices of social segregation, political repression, and community violence [that] accompanied the patterns of economic exploitation" in the U.S.-Mexico borderlands, which "locked the region's large Mexicano population in low wage work." *Id.* at 5. Mexicano children were segregated from white schools, Mexicano voters were disenfranchised, and "[p]olice violence against Mexicanos was common." *Id.* In some places, "'No Negroes, Mexicans, or Dogs' signs were posted on restaurant doors." *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

In determining whether Defendant has met his burden as to the enactment of 8 U.S.C. § 1326, historical evidence alone is insufficient. *Machic-Xiap*, 2021 WL 3362738, at *12; *see Arlington Heights*, 429 U.S. at 267-68. *Machic-Xiap* determined that "[t]he legislative history of § 1326 is inconclusive." 2021 WL 3362738, at *13. The court reviewed three statements that the defendant argued were "evidence of racial animus" that preceded the enactment of § 1326 in 1952: President Truman's veto and related statements; racist statements by one member of Congress who supported the INA; and a letter from Deputy Attorney General Peyton Ford addressing § 1326 and the "wetback problem." *Id. Machic-Xiap* reasoned that the statements by President Truman were of limited probative value because President Truman opposed the legislation and was concerned primarily with the use of quotas in the INA, rather than § 1326. *Id.* The statement by the single member of Congress was described as directed at the quota provisions in the INA. *Id.* Finally, *Machic-Xiap* concluded that the report from Deputy Attorney General Ford was of "limited" value because "Ford was not a member of Congress." *Id.* For these reasons, the court concluded that the aforementioned statements were insufficient evidence that racial animus was a motivating factor in the passage of § 1326. *Id.* at *13-14.

*Machic-Xiap* also rejected the defendant's argument "that the motivations of the Congress that passed the 1929 Act control absent evidence that the Congress who passed the INA or the Congresses that later reauthorized § 1326 affirmatively disavowed those motivations." *Id.* at *14. The court cited *Abbott v. Perez*, 138 S. Ct. 2305 (2018), for the proposition that "[p]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Id.* (quoting *Abbott*, 138 S. Ct. at 2324). Consequently, it concluded that the Government should not be required to provide "evidence that the 1952 Congress that passed the INA cured the discriminatory taint of the 1929 Act." *Id.*

*Carrillo-Lopez* reached a different outcome. It concluded that five parts of the evidence "specific to the 1952 enactment" supported the court's conclusion that the passage of § 1326 was motivated in part by discriminatory intent. 2021 WL 3667330, at *10. The first three relate directly to the legislative history of the statute. *See Arlington Heights*, 429 U.S. at 268. The final two relate to the sequence of events leading up to the enactment of the statute. *See id.* at 267.

First, the court concluded that absence of debate concerning the recodification of § 1326, "[w]hen considered in comparison with the express debate over other racially problematic predecessor statutes, . . . weighs in favor of establishing" the defendant's burden. *Id.* at *11. *Carrillo-Lopez* cited the opinions of Professor Gonzalez O'Brien, who "testified that the contrast between extensive congressional debate about other national origin provisions and the comparative lack thereof around Section 1326 suggests an acceptance of its history." *Id.* at *11. Thus, *Carrillo-Lopez* observed that "Professor Gonzalez O'Brien's testimony depicts a Congress [in 1952] that was more concerned with which racial and ethnic groups warranted continued discriminatory exclusion, rather than any desire to confront or revise the nativism reflected in the Act of 1929." *Id.*

Second, the court concluded that President Truman's veto of the INA, and his related statements critical of the legislation as continuing the discriminatory practices presented in earlier immigration laws, "expressly drew the INA into dialogue with prior immigration legislation, from both 1924 and 1929, which were concededly racist." *Id.* at *12. The court reasoned that the decision by Congress to override the veto, "while simultaneously making the INA, and particularly Section 1326, more punitive in nature, is evidence of at least indifference to the nativist motivations of the statute's predecessor." *Id.*

Third, the court analyzed the report of Deputy Attorney General Ford to the Chairman of the Committee on the Judiciary, which provided "the views of the Department of Justice relative to the bill." *Id.* at *13.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

The report recommended expanding the grounds for prosecution under § 1326 and "include[d] use of the racially derogatory word 'wetback.'" *Id.* at *13. Specifically, the report recommended clarifying the "found in" clause provided in § 1326, which "would overcome the inadequacies in existing law . . . arising in prosecutions against a deported alien under the 1929 act." *Id.* Because Ford's recommendation was "the only substantive change made to § 1326 in 1952," the court concluded that the "recommendation, conveyed to Congress along with racial slurs, was adopted by the 1952 Congress and became a part of Section 1326." *Id.*

Fourth, the court considered what was called the "Wetback Bill," which was "passed by the same congress during the same time frame and with the same express aim as illegal reentry." *Id.* at *14. The Bill was "nicknamed the Wetback Bill," and "throughout the debate, Mexican undocumented entrants [were] regularly referenced as wetbacks." *Id.* The court reasoned that "the incongruities between the stated intent of the bill and the actual language of the bill demonstrate the Congress' racist motives and intent." *Id.* It then stated that the Bill protected employers who hired undocumented immigrants while "punishing the laborers themselves," which "balance[d] the hunger of the agricultural industry for exploitable labor and the desire to keep America's identity white." *Id.* According to Professor Gonzalez O'Brien, the "Wetback Bill" also explains the lack of debate regarding § 1326 during the passage of the INA. Professor Gonzalez O'Brien testified that the lack of debate can be explained in part by "this Bill that precedes it by two months, where much of the debate is how do we limit the number of Mexican immigrants and the trafficking of undocumented Mexican immigrants into the United States[.]" *Id.* Considering this evidence, the court concluded, the Bill's "derogatory nickname" and "its criminalization of Mexican immigrant laborers while shielding employers evidences the racially discriminatory motives and intent of the same Congress who enacted Section 1326 only two months later." *Id.* at *15.

Fifth, the court concluded that because Congress knew § 1326 "continued to disparately impact Mexican and Latinx people" following its earlier passage in 1929, "Congress' silence about the prior racist iterations of this bill coupled with its decision to expand the grounds for deportation and carceral punishment . . . is some evidence that racial animus was a motivating factor." *Id.* In sum, taking the totality of the evidence into account, the court found that "the same factors motivating the passage of Section 1326 in 1929 were present in 1952." *Id.* at *16.

*     *     *

Based on an independent review of the evidence proffered in *Carrillo-Lopez* and *Machic-Xiap*, under the *Arlington Heights* factors, Defendant has failed to establish that racial animus was a motivating factor in the enactment of § 1326 in 1952.

It is very significant that there was a 23-year gap between the passage of the different legislation in 1929 and 1952. There were 11 Congressional elections during this period.[5] Furthermore, as the Fourth Circuit has concluded, district courts must afford a legislature "a 'presumption' of good faith." *North Carolina State Conf. of the NAACP v. Raymond*, 981 F.3d 295 (4th Cir. 2020) (quoting *Abbott*, 138 S. Ct. at 2324). There is substantial evidence that a discriminatory purpose was a motivating factor in the adoption of the 1929 legislation. However, as to the 1952 legislation, which was adopted by a different Congress, there is little evidence of "[d]epartures from the normal procedural sequence" in the passage of the statute, *Arlington Heights*, 429 U.S. 267, because "the INA followed a comprehensive review of

---

[5] Similarly, the Government has argued in another case that "[b]y 1952, all the proponents of the 1929 Act mentioned in defendant's motion were either dead (Harry Laughlin, Coleman Blease, James Davis, John Box, Martin Madden, William Lankford, and Harry Hull) or out of Congress (Albert Johnson, Patrick O'Sullivan, Robert Green, John Schafer, Roy Fitzgerald, and Thomas Blanton)." *Ramos*, Dkt. 76 at 27.

the entire panoply of the nation's immigration laws." *Machic-Xiap*, 2021 WL 3362738, at *14.

The language in each statute is "not identical." *Id.* at *15. For example, the INA amends the 1929 Act to include an undocumented migrant who has been "excluded," or is "found in . . . the United States." It also amends the 1929 Act by excluding under certain conditions an undocumented migrant as to whom "the Attorney General has expressly consented to such alien's reapplying for admission" or if the individual "shall establish that he was not required to obtain such advance consent." It is also significant that the INA was passed as "a comprehensive immigration statute designed to 'revise the laws relating to immigration, naturalization, and nationality.'" *Machic-Xiap*, 2021 WL 2021 WL 3362738, at *7 (quoting Immigration and Nationality Act of 1952, Pub L. No. 82-414, 66 Stat. 163); *see E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 756 (9th Cir. 2018) (explaining that "Congress replaced [a] disparate statutory scheme with the Immigration and Nationality Act ('INA'), which remains the governing statutory framework"). This also supports the view that in adopting § 1326 in 1952, Congress did more than simply re-adopt the 1929 Act.

Furthermore, "there is little legislative history about the enactment of § 1326 specifically." *Machic-Xiap*, 2021 WL 2021 WL 3362738, at *13. There is some legislative history that could support the view that Congress intended § 1326 to be a reenactment of the 1929 Act. One report from the Senate Committee on the Judiciary recommended joining other statutes with the 1929 Act to create one illegal reentry statute. *See* S. Rep. No. 1515, at 655-56 (1950) (noting that "[i]t was suggested that . . . the present act of March 4, 1929 should be reenacted to cover any and all deportations" and recommending that the "provisions relating to reentry after deportation should be carried forward in one section and apply to any alien deported for any reason and provide for the same penalty"). As to the statements by Deputy Attorney General Ford, they are not sufficient to establish the intent of Congress. Nor was the general statement by President Truman in connection with his veto.

Considering all of the foregoing under the presumption of legislative good faith supports the view that Congress reviewed § 1326 independently, as amended, and did not simply reenact the 1929 Act. It also shows that there is not a sufficient showing that racial animus was a motivating factor in the enactment of the INA in 1952.

For these reasons, Defendant has not met his burden as to the first factor under *Arlington Heights*. Therefore, the Motion is denied if this standard applies.

                              b.        Disparate Impact

Because Defendant has failed to establish that impermissible discrimination was a motivating factor for Congress's enactment of § 1326, it is unnecessary to address disparate impact. *Cf. Washington v. Davis*, 426 U.S. 229, 242 (1976) ("Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution. Standing alone, it does not trigger the rule that racial classifications are to be subjected to the strictest scrutiny and are justifiable only by the weightiest of considerations." (citation omitted)); *United States v. Armstrong*, 517 U.S. 456, 465 (1996) ("ordinary equal protection standards" require demonstrating that a policy "had a discriminatory effect and that it was motivated by a discriminatory purpose" (citation omitted)).

**III.**      <u>**Conclusion**</u>

For the reasons stated in this Order, because the Motion fails under both the "rational basis" and *Arlington Heights* standards, the Motion is **DENIED**.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

**IT IS SO ORDERED.**

                                                                                           :

Initials of Preparer    ha